416 S.E.2d 237

Ronald L. DIXON, Plaintiff
Below, Appellee,

v.

OGDEN NEWSPAPERS, INC.,
a Corporation, Defendant
Below, Appellant.

and

Donald J. NAEGELE, Plaintiff
Below, Appellee,

v.

OGDEN NEWSPAPERS, INC.,
a Corporation, Defendant
Below, Appellant.

No. 19425.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 11, 1991.

Decided Feb. 27, 1992.

Rehearing Denied May 13, 1992.

William R. Metzner, Wheeling, for appellees.

Herbert G. Underwood, Matthew J. Mullaney, Clarksburg, for appellant.

BROTHERTON, Justice.

The plaintiffs, Ronald L. Dixon and Donald J. Naegele, brought separate libel actions in the Circuit Court of Ohio County, West Virginia, against Ogden Newspapers, Inc., publisher of *The Intelligencer*, a newspaper with a circulation of approximately 24,000 in the northern panhandle of West Virginia. The two cases were consolidated for purposes of discovery and trial.

The defendant newspaper initially moved for dismissal in accordance with Rule 12(b)(6) of the West Virginia Rules of Civil Procedure. Thereafter, the defendant filed a memorandum in support of a summary judgment motion, arguing that the publication of the newspaper articles in question was protected by the common law reporters privilege as a fair and accurate report of an official proceeding. In an opinion and order dated February 28, 1984, the circuit court denied the defendant's motion and stated that whether the newspaper articles were actually a fair and accurate report of the magistrate court proceedings, and were therefore entitled to the reporter's privilege, was a triable issue of fact precluding summary judgment.

The case eventually proceeded to trial. The court denied defense motions for a directed verdict at the conclusion of the plaintiff's evidence and after all evidence had been presented. On October 31, 1988, a jury awarded each plaintiff $250,000 in compensatory damages and $25,000 in punitive damages. On March 9, 1989, the trial court granted the defendant's motion for judgment notwithstanding the verdict and eliminated the punitive damage awards. Ogden Newspapers, Inc., now appeals to this Court from both the jury verdict and the judgment entered by the court below on November 10, 1988. The newspaper argues that the plaintiffs failed, as a matter of law, to adequately demonstrate either the falsity of the story or that the story was published with the actual

malice required by *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny. We agree that the constitutional evidentiary requirement was not met in this case, and for the reasons set forth below, we reverse the judgment of the Circuit Court of Ohio County.

The plaintiffs, Dixon and Naegele, were policemen employed by the City of Wheeling when a trial took place in the Magistrate Court of Ohio County in Wheeling, West Virginia, on May 2, 1983. During the course of this trial, the defendant, local businessman George Stefanow, identified both plaintiffs as police officers with whom he discussed a police vice raid which transpired on July 15, 1982.

Warren Bays, a veteran reporter employed by *The Intelligencer,* was assigned to cover Stefanow's trial, which arose out of Wheeling rookie police officer Robert Heldreth's allegation that Stefanow threatened him over the telephone on July 17, 1982. Stefanow admittedly called Heldreth after he learned that in the course of the aforementioned vice raid, Heldreth used Stefanow's name to gain access to the "Green Door," a suspected house of prostitution located in Wheeling.

At this point, it is important to note that George Stefanow is the brother-in-law of one of the plaintiffs in this case, Donald J. Naegele. He is also an admitted antagonist and outspoken critic of the leadership of the Wheeling Police Department. The plaintiffs describe Stefanow as a man who was conducting his own war to cleanse the higher ranks of the police department of alleged corruption. Stefanow states that when he learned that his name had been used by Heldreth in the raid, he suspected that Wheeling's Chief of Detectives Joseph S. Davis, Jr., Chief of Police Edward Weith, Jr., and members of Wheeling's vice squad had instructed Heldreth to use his name as a retaliatory measure to foster animosity

toward Stefanow among his prospective constituents.[1] At the time of the incidents which give rise to this action, Stefanow was a candidate for election to the Wheeling City Council.

According to the plaintiffs, Stefanow contacted each of them by telephone several days after the raid. Dixon states that, in response to Stefanow's questioning, he told Stefanow that the name of the police officer who had made the raid on the Green Door was Robert Heldreth. According to Dixon, this information was available to the public, and he gave it out over the phone in his official capacity as a sergeant. Later, in response to a separate phone inquiry, Officer Naegele told Stefanow that he had never heard of Officer Robert Heldreth.

Two days after the July 15, 1982, vice raid, Stefanow contacted Heldreth by telephone. In testimony given at trial on May 2, 1983, Stefanow stated that he called Heldreth because he wanted to know why Heldreth used his name to gain entrance to the Green Door. Stefanow said he wanted to know who told Heldreth to use his name, "[b]ecause I have lawsuits against [Detective Steve] Habursky and the police force, vice squad people." As a result of the call, Stefanow was subsequently charged with and tried for the alleged offense of telephone harassment.

Following Stefanow's trial on May 2, 1983, Warren Bays' report of the proceedings appeared in two separate news stories in the May 3, 1983, edition of *The Intelligencer,* which is a morning newspaper. One article appeared on page one with the headline "Stefanow: Policeman Supplied Information," and a lead paragraph which stated that "Wheeling tavern owner George Stefanow testified Monday that his brother-in-law, Patrolman Donald Naegele, and Sgt. Ronald Dixon of the Wheeling Bureau of Police supplied Stefanow information about a vice raid last summer." A

---

1. Stefanow testified that the day after he learned his name had been used, he approached Chief Weith, who was joined by Detective Davis, and asked them why they would use his name: "Davis informed me we use any ploy we can, anybody's name or any ploy we can to get into a house of prostitution. I said, 'In other words, you condone using my name?' and he said, 'We will use any name.' and I said, 'What if I used your name if I go to rob a bank? Would you like that?'"

second, lengthier article, entitled "Stefanow Found Innocent in Phone Threat" was on page eleven, which was the first page of the second or city section. These two news stories formed the basis for the libel actions filed by police officers Dixon and Naegele, who alleged that the newspaper was guilty of libel by innuendo which damaged their reputations.[2]

The plaintiffs concede that both of the articles written by Bays were substantially accurate and true "as far as they went." However, they maintain that material facts were omitted and, as a result, their reputations were damaged by the innuendo and the inferences that readers may draw from the two articles. The plaintiffs contend that the articles imply that they each gave Stefanow information concerning the July 15, 1982, police vice raid on the Green Door in advance of the raid, and thus interfered with the raid in some undisclosed manner. The plaintiffs further allege that Warren Bays intentionally designed the story so as to permit these inferences, in furtherance of a conspiracy between Bays and police Lt. Joseph Davis to damage the reputations of Officers Dixon and Naegele.

Elaborating on their argument, the plaintiffs maintain that Stefanow's trial testimony was quite clear with respect to both the mundane nature of his discussions with Dixon and Naegele and to the post-raid time frame, but that Bays nevertheless "transformed" Stefanow's truthful and nondefamatory testimony into false and defamatory news accounts of that testimony. The plaintiffs argue that they successfully proved at trial that Bays made this so-called transformation knowingly, intentionally, and maliciously, as a favor to his longtime friends, Lt. Davis and Chief Weith, who were political adversaries of Stefanow

and viewed Dixon and Naegele as two of Stefanow's strongest supporters within the police department.

In its defense, the newspaper offers that the contents of the two stories were true and accurate. Bays testified that he did not have access to a transcript of the trial proceedings, but he constructed what he believed to be a fair summary of what occurred at Stefanow's trial from his notes. The newspaper submits that when the context of an article is substantially true, innuendo alone is insufficient to support a public official's claim of libel. Further, because First Amendment defenses are involved, a trial court must make an independent determination of whether an article is capable of a defamatory connotation and whether the evidence presented satisfies the constitutional standards by proving actual malice with "convincing clarity."

■ Both parties to this case stipulated to the plaintiffs' designation as "public officials." [3] In syllabus point 4 of *Long v. Egnor*, 176 W.Va. 628, 346 S.E.2d 778 (1986), this Court stated that:

"[A] public official ... can sustain an action for libel only if he can prove that: (1) the alleged libelous statements were false or misleading; (2) the statements tended to defame the plaintiff and reflect shame, contumely, and disgrace upon him; (3) the statements were published with knowledge at the time of publication that they were false or misleading or were published with a reckless and willful disregard of truth; and, (4) the publisher intended to injure the plaintiff through the knowing or reckless publication of the alleged libelous material." Syllabus Point 1, in part, *Sprouse v.*

**2.** *See* Note, *The Art of Insinuation: Defamation by Implication,* 58 Fordham L.Rev. 677, 679 n. 14 (1990). The author states that courts "use the terms implication, innuendo, and impression interchangeably." However, the commonly understood meaning of innuendo is "the implication arising from a literal statement." *Id.*

**3.** "Police and other law enforcement personnel are almost always classified as public officials. It is hard to conceive of speech more vital to a free and democratic society than speech con-

cerning public officials, for the police are the embodiment of the government's maintenance of social order." R. Smolla, *Law of Defamation* § 2.26[1] (1991); *see Starr v. Beckley Newspapers Corp.,* 157 W.Va. 447, 201 S.E.2d 911 (1974), in which this Court held that "[a] municipal police sergeant is a 'public official' within the contemplation of the New York Times Co. v. Sullivan case and must, therefore, allege and prove actual malice in order to recover in a libel action against a newspaper." *Id.* at syl. pt. 1.

*Clay Communication, Inc.*, 158 W.Va. 427, 211 S.E.2d 674, 95 A.L.R.3d 622, *cert. denied*, 423 U.S. 882, 96 S.Ct. 145, 46 L.Ed.2d 107 (1975).

Before we examine the evidence which was presented in this case, we will briefly address the appropriate standard of review. In *Sprouse v. Clay Communication, Inc.*, 158 W.Va. 427, 211 S.E.2d 674, 681 (1975), this Court stated that "[u]nder the mandate of *New York Times v. Sullivan, supra*, it is incumbent upon an appellate court in determining the validity of a libel judgment both to consider the law and to make an independent evaluation of the evidence to insure First Amendment protection to publishers." "[W]here First Amendment rights are implicated, courts have applied a stricter standard in judging the sufficiency of a complaint." *Long v. Egnor*, 176 W.Va. 628, 346 S.E.2d 778, 782 (1986). In syllabus point 2 of *Mauck v. City of Martinsburg*, 167 W.Va. 332, 280 S.E.2d 216 (1981), we stated that as a result of *New York Times v. Sullivan*, "whenever there is a First Amendment defense to actions under state law, the state court is required to be a judge of both the facts and the law...."

The standard of review that an appellate court must apply to a libel case was refined by the United States Supreme Court in *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502, 523 (1984), wherein the high Court explained:

The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

"A court must decide initially whether as a matter of law the challenged statements in a defamation action are capable of a defamatory meaning." Syllabus point 6, *Long v.*

*Egnor*, 176 W.Va. 628, 346 S.E.2d 778 (1986).

In the case now before us, the trial court denied the newspaper's motion for summary judgment on February 28, 1984, stating that the facts did not warrant summary judgment because the fairness and accuracy of the newspaper articles were issues to be determined by a jury. Therefore, we must determine first whether Bays' articles were capable of a defamatory meaning, and, if so, whether the judgment entered for the plaintiffs was supported by clear and convincing proof of actual malice.

The appellant argues that the articles written by Bays, together with any innuendo that could reasonably flow from their omission of the fact that the vice raid information was not communicated to George Stefanow until after the raid, are not defamatory as a matter of law and the trial court erred in failing to make this preliminary finding. We agree.

The plaintiffs' evidence of actual malice consisted primarily of alleged conspiratorial ties between *Intelligencer* reporter Warren Bays and the Wheeling Police Department. Bays and Chief of Detectives Joseph Davis were admittedly personal friends. Bernard "Sonny" Watson, who was an employee of George Stefanow, testified that when Bays and Davis were leaving the courtroom after Stefanow's trial, Davis said something to the effect of "get those m-f-'s" and that Bays then nodded and winked in response.

The plaintiffs also cited Bays' two May 3, 1983 newspaper articles as further evidence in support of their conspiracy theory. They argue that both articles contained exaggerated, distorted, and misleading renditions of the substance of Stefanow's testimony. They maintain further that the published accounts were enhanced by suggestive comments portraying the plaintiffs as "informants" and "sources" who "leaked" sensitive police information in an attempt to frustrate a vice raid and who had probably "leaked" sensitive police information to

outsiders to frustrate other covert police operations on other occasions.

More specifically, the plaintiffs state that a comparison of Stefanow's trial transcript with the inside news article written by Bays "reveals ... that the two quotations were fabricated. Each fabricated quotation was instrumental in misleading readers...." The quotations the plaintiffs refer to are the use of the word "sources" to describe Dixon and Naegele and a statement attributed to Stefanow that he "had been alerted" about Heldreth. The plaintiffs claim that the word "sources" implied that Stefanow had an ongoing relationship with Dixon and Naegele. Further, they argue that by stating that Stefanow "had been alerted" about Heldreth, the article "implies that the identity of Heldreth as an undercover officer had been imparted by Dixon and Naegele to Stefanow in advance of the raid."

The plaintiffs also object to a sentence in the article in which Bays wrote that "In answer to a question ... Stefanow said he 'sometimes asks' the two police officers questions 'and they give me information.'" A review of the transcript reveals that in response to the prosecutor's question about whether he discussed "other events that occur in your neighborhood with these police officers?", Stefanow responded, "Yes, because that is my neighborhood." Shortly thereafter, Stefanow was again asked, "You ask them and do they tell you what is going on?" He replied, "Sometimes."

The portion of the newspaper article which contains the specific quotations objected to by the plaintiffs states as follows:

> Under questioning by Ohio County Assistant Prosecutor A. Dana Kahle, *Stefanow identified his informants on the police force as "my brother-in-law Don Naegele and Sgt. (Ronald) Dixon."*
>
> Stefanow had at first refused to identify his *"sources"* on the police force "because it might incriminate the officers," but after consulting with his attorney, William Metzner, he agreed to testify about information given him concerning the vice raid in Center Wheeling.

> "I discussed it with Don Naegele and Sgt. Dixon," Stefanow said. In answer to a question from Kahle, *Stefanow said he* "sometimes asks" the two police officers questions "and they give me information."

However, there was no testimony as to exactly what was discussed between Stefanow and the police officers. Stefanow said it was common knowledge that a "rookie" is used on vice raids and that he had "obtained information" about Heldreth before he had ever met the new policeman.

"Police officers told me he had only been on the force for two days," Stefanow told the court. He further said *"I had been alerted" about Heldreth.* (Emphasis added.)

The transcript of Stefanow's testimony at his May 2, 1982, trial confirms that Stefanow never actually stated that he "had been alerted" about Officer Heldreth. However, Stefanow did state that when he tried to obtain information about Heldreth, he learned that Heldreth was a rookie who had only been on the force two days. Stefanow did not testify that he got information only from the plaintiffs. In fact, in the next paragraph of the article quoted above, Bays reported that "He [Stefanow] identified Lucille Riggi, who has been cited by police for operating an alleged house of prostitution, as one person having given him information on the new officer and the vice raid." Most importantly, nothing in either of the two news articles suggested that the vice raid was compromised in any manner because of the information Stefanow received from the plaintiffs.

Although it is evident from the transcript that Stefanow never used the words "sources" or "informants" to describe the plaintiffs, the article accurately reported Stefanow's reluctance to respond when questioned about who "informed" him of the raid. When asked, "Would you tell us the names of those police officers that gave you information?", Stefanow replied, "I will not because it would tend to incriminate them." When considered within this context, Bays' use of the words "sources"

or "informants"[4] was not inappropriate, and it certainly could not be characterized as a "knowing falsehood."[5]

With regard to the precise time of the vice raid information disclosure, Stefanow testified that Dixon and Naegele gave him information after the raid. In denying Ogden Newspapers' motion for summary judgment on February 28, 1984, Circuit Court Judge Ronald Wilson wrote that, "[t]he testimony was quite clear that the information given to Mr. Stefanow was given sometime after the Wheeling police raid on a suspected house of prostitution. That acute information is nowhere to be found in either article." Judge Wilson concluded by asking, "[w]ithout that information can it be found that as a matter of law the article accurately reported the judicial proceeding?"

On this point, reporter Warren Bays testified that the whole day in court was confusing. When he was questioned about exactly when Dixon and Naegele gave Stefanow information about the raid, Bays stated, "I think it was unclear to an awful lot of people."[6] Bays also testified that it was "absurd" to charge that he purposely omitted the time of the information transfer. He pointed out that his articles did not state that the information was given out either prior to or after the raid.

We believe it is necessary to emphasize that the implication that the plaintiffs were engaged in wrongdoing was not raised first by Bays' omission of the time frame information in his articles, but by Stefanow's testimony, in which he related his fear of "incriminating" the officers. This exchange between Stefanow and the prosecution was reported with substantial accuracy in Bays' article. Bays also wrote that, "[t]here was no testimony as to exactly what was discussed between Stefanow and the police officers." It is important to note as well that in his article, Bays included Police Chief Weith's comment that Stefanow's testimony in and of itself was not indicative of wrongdoing. Weith stated that he would "study the testimony given" to determine if "official police business had been leaked out." This is the sole reference to a "leak" of any sort in either of Bays' May 3, 1983, articles, and it is consistent with two earlier articles written by Bays which were published in *The Intelligencer* on March 12, 1983, and March 16, 1983, with headlines which stated "Rift in Police Ranks Appears to Widen" and "Weith Faults 'Outside Influence.'"

In the March 12, 1983, article, Bays reported how divisions within the police department were growing wider after the March 11, 1983, assault hearings in which

---

4. The defendant refutes the plaintiffs' suggestion that the use of the term "informant" is in a context leading an individual "to believe that he supplied confidential police information to Stefanow to which Stefanow had no right." The plaintiffs point out that Stefanow was responding to the assistant prosecuting attorney's request that he name the police officers "that informed you of the raid." The plaintiffs offer the following definitions to support their argument:

> An INFORMANT is one who gives information of whatever sort; an INFORMER is one who informs against another by way of accusation or complaint. *INFORMER* is often, INFORMANT never, a term of opprobrium. *Webster's New International Dictionary*, Second Edition, Unabridged (1950 Ed.).

5. In *Masson v. New Yorker Magazine, Inc.*, 501 U.S. ——, ——, 111 S.Ct. 2419, 2437, 115 L.Ed.2d 447, 472 (1991), the United States Supreme Court addressed the issue of whether actual malice is demonstrated through the publication of a quotation with the full knowledge that the

quotation does not contain the exact words used by a public figure. The Court rejected this strict standard, with Justice Kennedy writing that, "[i]f an author alters a speaker's words but effects no material change in meaning, including any meaning conveyed by the manner or fact of expression, the speaker suffers no injury to reputation that is compensable as a defamation."

6. We note that in a separate May 3, 1983, article describing the events at Stefanow's trial which appeared in another Wheeling newspaper, *The News–Register,* under the headline "'Keystone Kops' Delay Testimony," staff writer Andy Wessels did not include the precise time that Naegele and Dixon offered Stefanow information. In the fourth paragraph of this article, Wessels wrote that Police Chief Weith "promised to investigate testimony by the defendant, George Stefanow, which revealed that Patrolman Donald Naegele and Sgt. Ronald L. Dixon offered him information about a vice raid on an alleged house of prostitution at 2126½ Main St. on July 15, 1982."

one of the plaintiffs herein, Ronald Dixon, was a key figure. Bays wrote that, "[t]estimony also brought out that Dixon had once been in charge of the detective division which is now headed by Lt. Davis. Dixon said he lost the job as chief detective 'the day Ed Weith became chief.'"

However, neither Dixon nor Naegele were mentioned in the March 16, 1983, *Intelligencer* article in which Bays reported Chief Weith's charges that "outside influences" were tampering with certain police officers and that "'only about six or so' officers are 'disgruntled enough' to cause dissension in the ranks." It was apparently no secret that George Stefanow was the "outside influence" Weith referred to, because his allegations of police corruption were well-known. The March 16, 1983 article also reported Weith's concern that some police department information was being "leaked" to outsiders: "We've sent new men out on undercover work, and on assigned raids, and their identity has been known by the time they left the building ... We can't keep the identity of a new officer secret. Their description is given to certain people...."

We reiterate that these two articles written by Bays appeared in *The Intelligencer* approximately six weeks prior to the magistrate court trial at which George Stefanow was asked to identify the police officers who provided him with information about a raid. He responded to this inquiry by stating, "I will not because it would tend to incriminate them." The subsequent May 3, 1983, articles did not describe the plaintiffs as police officers who were responsible for any leaks of information in advance of police activities, nor did the articles suggest that the police officers had attempted to "frustrate" the vice raid by providing Stefanow with information. In fact, Chief Weith's own statement, which was quoted twice by Bays, made it quite clear that neither officer had been accused of any type of wrongdoing in connection with a disclosure of information to Stefanow.

Our analysis in this case is complicated to a degree by the fact that the newspaper articles at issue hurl no outright accusations of wrongdoing by the plaintiffs, nor do they express any opinion as to the plaintiffs' conduct. Instead, it is from the omission of one fact that the plaintiffs derive their allegation that the newspaper intended to defame them through the inferences readers may draw from the statement that the plaintiffs supplied Stefanow with information. However, Stefanow's testimony was clear on this point: the plaintiffs did provide him with information when he requested it on at least one occasion. Whether the plaintiffs were wrong to do so, and whether there were other disclosures, were matters left to further investigation, and the articles make this clear. The newspaper did not draw any conclusions about what the plaintiffs did or did not do.

 Evidence that a media defendant intentionally "avoided" the truth in its investigatory techniques or omitted facts in order to distort the truth may support a finding of actual malice necessary to sustain an action for libel. In this instance, this Court is convinced that the judgment for the plaintiffs must be reversed unless the newspaper intentionally omitted the time of the vice raid information disclosure in order to leave readers with the impression that the plaintiffs wrongfully supplied Stefanow with information. Evidence of such behavior would support the conclusion that the newspaper published the article with knowledge that it was "false or misleading" or with a reckless and willful disregard of the truth. However, this is unquestionably a difficult thing to prove with "convincing clarity," and we do not believe it was done by the conspiracy theory advanced by the plaintiffs in this case. The newspaper persuasively points out that if there is a "sting" in its articles, it is found not in the fact that Stefanow received information about the vice raid either before or after the raid, but in the fact that Stefanow received any information at all from these police officers at any time. Such an assertion is bolstered by Stefanow's reluctance at his trial to reveal the names of the police officers for fear of "incriminating" them, as well as by the newspaper's report nearly two months earlier of Chief Weith's

concern that police department information was being leaked to outsiders.

Thus, after reviewing both the transcripts of the proceedings below and the contents of the two newspaper articles written by Warren Bays, we conclude that the plaintiffs did not present the clear and convincing evidence of actual malice that public officials are required to show in order to sustain an action for libel. Actual malice must be proven with convincing clarity, and the plaintiffs in this case simply did not offer sufficient evidence to meet this standard.

For the foregoing reasons, the judgment of the Circuit Court of Ohio County is reversed.

Reversed.