446 S.E.2d 165

**Sydney O. METZNER, Plaintiff Below, Appellant,**

v.

**William R. METZNER, Defendant Below, Appellee.**

No. 21380.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 11, 1994.

Decided May 27, 1994.

Frank Cuomo, Jr., Wellsburg, for appellant.

William R. Metzner, pro se.

BROTHERTON, Chief Justice:

In this case, we are asked to determine whether the compensation that an attorney might receive for contingent fee contracts and other future earned fees for cases which are pending at the time of a divorce is "marital property" within the meaning contemplated by West Virginia Code § 48–2–1(e)(1): "property and earnings acquired ... during the marriage." The appellant, Sydney O. Metzner, now appeals from the lower court's ruling that only accounts receivable as of the date of separation are considered as marital property subject to equitable distribution.

The parties herein, William R. and Sydney O. Metzner, were married on September 6, 1965, in Ohio County, West Virginia. They separated after twenty-four years of marriage on March 8, 1989, when Mrs. Metzner filed a complaint in the Circuit Court of Ohio County seeking an absolute divorce, equitable distribution of marital property, alimony, and allocation of marital debts. The Metzners have two children, both emancipated.

Before we discuss the trial court's distribution of the couple's assets, a brief overview of their employment and financial histories is necessary. After graduating from law school at the University of Cincinnati in June, 1965, Mr. Metzner worked as an associate in two Wheeling, West Virginia, law firms from September, 1965, through December, 1969. He practiced law in a partnership with another attorney in Wheeling from January, 1970, through September, 1981. In October, 1981, he became a solo practitioner.

Mr. Metzner states that low net profits in 1985 and 1986, "coupled with extraordinary expenses for the children's educations, the daughter's marriage, and the payment of the wife's 'secret' debts," contributed to his inability to pay his tax obligations until the following years. In 1987, the parties bought a home in Morgantown, West Virginia, for their son to live in while attending college, with the intention of procuring other tenants to reside in the house and contribute rent. Mr. Metzner now describes this as a "regrettable purchase" and states that the house's market value declined because of the extensive damages it sustained during its occupancy by his son and his friends. Liens for delinquent taxes arose in 1988 and 1989.

During the years 1975–1979, Mrs. Metzner occasionally did secretarial work for the law partnership. Her earnings in these years were $1,700 (1975), $1,900 (1976), $2,100 (1978), and $3,100 (1979). In 1980, Mrs. Metzner began working full time as a secretary for Youghiogheny & Ohio Coal Company (Y & O). She was terminated in 1986 for alleged insubordination. Mrs. Metzner's

gross earnings ranged from $9,759 in 1980 to $17,230 in 1985. Early in 1986, she earned several thousand dollars at Y & O, and Mr. Metzner paid her $3,000 for working in the law firm from June through August, 1986. Her gross earnings in 1986 were $7,347. Also, during 1986 and for much of 1987, Mr. Metzner's elderly uncle paid her $800 a month to fix his meals and provide him with companionship. Mrs. Metzner testified that "then I had a lot of cash." Mr. Metzner states that Mrs. Metzner received unemployment benefits and her Y & O retirement fund ($6,500) during this time, and he also indicates that, at his wife's request, he took over payments on a Cadillac she bought in May, 1985, "the only so-called 'basic' bill on which she ever had paid."

Following their separation, the parties eventually agreed on temporary relief for Mrs. Metzner, and an interlocutory order was entered by the family law master on May 31, 1989. The order awarded Mrs. Metzner temporary use and occupancy of the marital home and directed Mr. Metzner to continue to pay the monthly installments on two bank loans secured by liens against the marital home and the residence in Morgantown (including real estate taxes and casualty insurance for the marital home) and to continue to pay for all of the utility services, except the telephone, used in the marital home. According to the order, this temporary relief was to expire on July 1, 1989. This order also provided for the exchange by the parties of financial disclosures of assets and liabilities within a reasonable time prior to July 1, 1989.

The final divorce hearing was held before the family law master on December 19, 1989. Mrs. Metzner did not appear in person or by counsel. Mr. Metzner presented evidence to support absolute divorce on grounds of irreconcilable differences, but requested that the family law master reserve all economic issues, including equitable distribution, for later decision.

Through a new attorney, Mrs. Metzner filed a petition on December 27, 1989, setting forth her exceptions to the family law master's recommended decision and seeking to disqualify both the family law master and her husband's attorney from the case. Mrs. Metzner's petition and motions were heard and argued before Judge Tsapis on February 2, 1990.

Following this hearing, Judge Tsapis assumed jurisdiction over this case and accepted the recommendations of the family law master, awarding the parties an absolute divorce on grounds of irreconcilable differences and reserving all other issues for later decision. In addition, Judge Tsapis continued Mr. Metzner's obligations to Mrs. Metzner under the May 2, 1989, interlocutory order and added that Mr. Metzner was to pay any medical expenses incurred by Mrs. Metzner that were not covered by her insurance.[1]

On February 8, 1990, Mr. Metzner was served with combined interrogatories and requests for production of documents. Mrs. Metzner sought lists of all Mr. Metzner's work in progress, including contingent fee cases as of the date of separation, and copies of all time logs, files, ledgers and other materials related to such work. She also sought copies of all fee-splitting agreements as of the date of separation, copies of all monthly billings and accounts receivable since the date of separation, all year-end financial accountings and tax returns for 1988 and 1989, copies of all bank statements, deposit slips, and cancelled checks, and a list of all fixed [tangible] assets used in his law practice, and their market values, as of the date of separation. Mr. Metzner objected to the discovery requests for a variety of reasons, including his physical inability to perform the work necessary for compliance after he had a heart attack on March 14, 1990.

On May 17, 1990, the trial court issued a memorandum which directed Mr. Metzner to comply with Paragraph H of the discovery requests (accountings and tax returns for 1988 and 1989), requested a medical report

---

1. Mr. Metzner states that he voluntarily continued to maintain private medical insurance coverage on Mrs. Metzner until January 1990, just as a precautionary measure, even though medical insurance coverage had been provided through her employment with Wheeling–Pittsburgh Steel Corp. since March 1989.

from his doctor, and scheduled a hearing for June 1, 1990, to determine the date of separation.

In a memorandum of opinion dated July 3, 1990, the trial court stated that the separation date for purposes of equitable distribution was March 8, 1989. The court also indicated that Mr. Metzner's work in progress, including potential fees in contingent fee cases, were not marital property subject to equitable distribution. However, the court decided that his accounts receivable as of the date of separation were marital property.

For this reason, the lower court sustained Mr. Metzner's objections to paragraphs A through E of the discovery requests (relating to work in progress, particularly contingent fee cases), but directed him to respond to paragraphs F through J (fee-splitting agreements, accounts receivable, accountings and tax returns, bank account records, and fixed assets) within twenty days. On July 23, 1990, Mr. Metzner served Mrs. Metzner with the written, verified responses to the discovery requests with which he was required to comply.

A trial of the economic issues was held on March 6, 1991, after which the trial judge directed the parties to file their proposed plans for equitable distribution within fifteen days of her rulings on other matters. The trial judge also opined that the division of marital debts, including Mr. Metzner's tax liabilities, should be a part of any equitable distribution plan. At this point, the trial judge also promised to reconsider her previous rulings regarding what constitutes marital property subject to equitable distribution and to consider the defendant's request that he be granted some relief from what he described as his "protracted obligation to maintain the gainfully employed plaintiff in the marital home without any participation by the plaintiff in the payment of the parties marital debts." The trial judge commented that the defendant has "gone this far" so "he might as well swallow the tail, too," but nevertheless recognized that "it isn't quite fair for him to continue to pay her utilities ..." much longer.

In a memorandum of opinion dated March 12, 1991, the trial court reconsidered the marital property issue. The court stated that "the only assets of the law practice subject to equitable distribution are personal property, such as furniture, appliances, and equipment; any other tangible or intangible property, *and all accounts receivable as of the date of separation.* Therefore, the interrogatories dealing with the caseload, future expected fees, value of certain cases, etc., should not be discoverable." (Emphasis added.)

The court also addressed Mrs. Metzner's assertion that she was entitled to a portion of a fee from a particular case because it should be considered as "accounts receivable." The trial of this case resulted in a one-half million dollar verdict, which was then appealed to this Court and subsequently overturned.[2] With respect to this case, the lower court noted that:

> The defendant plans to do additional research, write a brief, appear in Charleston for oral arguments, etc. This court disagrees with plaintiff's contention. The March 8, 1989 [separation date] deadline has long passed, and the fee from the case being discussed was not an account receivable on that date; nor do we know if that verdict will stand or not. Any value placed on this case would be pure speculation, and would also represent, in part, earnings of the Defendant after the separation and even after the divorce.

The court concluded that "its ruling as to the law practice marital assets is correct and should not be changed."

The trial court also relieved Mr. Metzner from the obligation to pay Mrs. Metzner's utilities (beginning April 1, 1991), and her medical expenses (beginning March 15, 1991), but continued his interlocutory obligations to pay the installments of the parties' mortgages, taxes, and insurance on the marital home until further order of the court.

---

**2.** *See Dixon v. Ogden Newspapers, Inc.,* 187 W.Va. 120, 416 S.E.2d 237, *cert. denied,* —— U.S. ——, 113 S.Ct. 325, 121 L.Ed.2d 245 (1992).

On March 26, 1991, the circuit court declined to consider a $6,400.00 contingent fee to be marital property in this case. Mr. Metzner collected the fee after settling a personal injury case which was still pending on the parties' separation date. According to Mr. Metzner, the settlement of over $20,000.00 was only tentatively agreed to as of the date of separation and did not become firm until after the client's medical bills were negotiated and the liability insurer of the alleged tortfeasors later agreed with its attorney to make the tentative settlement firm. Although Mrs. Metzner argued that this fee was marital property and should be divided between the parties, the lower court disagreed: "Adhering strictly to its ruling that all accounts receivable as of the date of separation were marital property; and noting that the settlement had not been agreed upon as of that date, this Court is of the opinion that said fee should not be treated as marital property."

The trial court's final rulings on economic issues were set forth in a memorandum of opinion on September 9, 1991. The court's conclusions regarding equitable distribution of the marital property closely tracked the first of three alternative proposals that Mr. Metzner submitted after the March 6, 1991, trial. Mr. Metzner states that all three of his proposals revolved around the sale or retention of the marital home by the parties, since the plaintiff had expressed her desire to "live there and maybe have something to leave to my children."

Mr. Metzner's first alternative proposal provided for the sale of the marital domicile, the use of the proceeds of the sale to pay off the balance of the first and second mortgages (at trial, $5,837.00 and $18,421.78, respectively) and the balances of the tax liens for 1988 and 1989 (at trial, $18,908.96 and $8,530.61 respectively), and the distribution of the remaining sale proceeds (conservatively valued at trial at $8,302.15) to Mrs. Metzner.

The second alternative proposal provided for Mrs. Metzner to retain the marital home (including the entire $8,302.15 equity value) if she would pay the above-mentioned liens with the proceeds of a bank loan.

The third alternative proposal called for retention of the marital home by Mr. Metzner if he would pay Mrs. Metzner $8,000.00 for the entire equity value and assume payment of all liens (a total of $51,697.85 at time of trial).

Under all three proposals, Mrs. Metzner would retain her separate property ($9,000.00), and Mr. Metzner would retain his separate property ($1,925.00). All three proposals also contained common terms for the division of other marital assets. Under each, Mrs. Metzner would retain her 1984 Cadillac (separation date value of $8,000.00), and take all household furnishings and appliances ($2,500.00), while Mr. Metzner would retain his 1984 Chevrolet ($5,500.00), his tangible law office assets ($4,961.00), his law office accounts receivable (separation date net value $3,208.39), his individual retirement account at New York Life Insurance Company (net value of $5,965.00 when redeemed in June, 1990), and his stock in Greyhound Corp. ($300.00).

Under each proposal Mr. Metzner would also assume sole responsibility for paying the remaining liabilities ($5,750.20 at date of trial) he incurred to bail his son out of numerous financial problems, and he would not expect any partial reimbursement for having paid his own charge accounts and credit card accounts ($1,613.00) which had existed at the separation date. These would be treated as separate liabilities, rather than marital debts, so they would not factor into any equitable distribution of marital assets.

In dividing the property along the lines suggested by Mr. Metzner's first alternative proposal, the trial court expressly accepted as true, accurate, and complete the defendant's 1989 financial disclosures, the updated disclosures he presented at trial, and his alternative proposals. Mrs. Metzner did not submit any proposals or file any disclosure reports, in contravention of the disclosure requirements set forth in W.Va.Code § 48–2–33 and prior court orders.

The trial court further found that if the net proceeds of the directed sale of the marital home turned out to be less than $8,000.00, the court "would still consider that [lesser] amount equitable since the plaintiff had sole

occupancy of that house since at least the early part of 1989." Mr. Metzner had paid $42,318.67 between the separation date and the trial date on the parties' debts and toward maintenance of the marital home. The trial court also rejected Mrs. Metzner's assertions that Mr. Metzner had wasted substantial marital funds on alcohol and gambling.

The trial court directed Mr. Metzner to pay the debts he proposed to pay, but awarded no alimony, although it reserved to Mrs. Metzner a right to alimony if circumstances changed and it was needed in the future. The court explained that it ruled as it did with regard to the payment of marital debts because Mr. Metzner's earning capacity is greater than that of Mrs. Metzner and because of "inequitable conduct" by Mr. Metzner, including unkind treatment of Mrs. Metzner, unnecessary absences from home, and failure to participate in family activities. The trial court also ordered Mr. Metzner to pay Mrs. Metzner $10,000.00 to reimburse her for "her assistance to him while he studied law in Cincinnati and her assistance to him in his law practice, such as typing, answering the telephone, etc." In a later ruling, the trial court awarded Mrs. Metzner counsel fees and expenses in the amount of $2,304.00.

On December 27, 1991, the trial court clarified its reasons for directing that the 1988 and 1989 federal tax liens be satisfied out of the proceeds of the sale of the marital home and appointed a special commissioner to report a plan for the sale of the marital home and hold the proceeds for division as previously ordered. The court reiterated that all of Mr. Metzner's federal and state tax debts for 1988 accrued before the parties' separation and that, although only part of the 1989 federal tax debt accrued as of the separation date, he paid the entire 1988 state tax debt from his post-divorce funds in December, 1989, with interest of $3,833.35, and in 1990 the sum of $8,200.66 (by levy of $7,546.74 on January 10, 1990, and by payment of $653.92 in June, 1990) toward the 1988 federal tax debt. The court concluded that the substitution, in essence, of the 1989 federal tax debt for the greater sums paid by the defendant

with his post-divorce funds to reduce the 1988 marital tax debts was equitable.

 The appellant, Mrs. Metzner, now argues that the trial court abused its discretion and did not make the findings necessary to grant a fair and equitable distribution of the marital assets. "For purposes of equitable distribution, W.Va.Code, 48–2–32(d)(1) (1984), requires that a determination be made of the net value of the marital property of the parties." Syllabus point 2, *Tankersley v. Tankersley,* 182 W.Va. 627, 390 S.E.2d 826 (1990). In syllabus point 1 of *Hamstead v. Hamstead,* 178 W.Va. 23, 357 S.E.2d 216 (1987), *overruled on other grounds, Roig v. Roig,* 178 W.Va. 781, 364 S.E.2d 794 (1987), this Court held that:

> *W.Va.Code,* 48–2–33 [1984], requires a full disclosure of one spouse's financial assets to the other spouse at the time of divorce, and contemplates a meaningful hearing on the subject of equitable distribution of property at which the spouse submitting financial data may be cross-examined concerning the nature, origin and amount of assets.

The appellant's primary argument in this case is that she was entitled to an interest in accounts receivable as well as any contingent fees that her husband may ultimately receive from his pending cases. She also contends that the lower court should have permitted her to have her husband's cases examined and audited by an independent expert in order to determine their actual and potential value.

The characterization of contingent fees for purposes of equitable distribution is an issue of first impression in West Virginia. Research indicates that several states have held that an attorney's contingent fee cases should be treated as marital property upon divorce, while several others have found just the opposite and concluded that contingent fees are not marital property subject to equitable distribution. In some instances, contingent fees are valued in the context of an examination of an entire law firm's worth, and not for

purposes of distribution.[3] Overall, only a handful of courts have addressed the specific issue that is now before us, and there is no apparent bright line majority rule.

For example, in *Goldstein v. Goldstein,* 262 Ga. 136, 414 S.E.2d 474, 476 (1992), the Supreme Court of Georgia held that contingent fee agreements were "too remote, speculative and uncertain to be considered marital assets in making an equitable division of property." However, in a dissenting opinion in *Goldstein,* one justice noted that "[p]ractically all jurisdictions that have addressed the issue have determined that contingent fee contracts constitute marital property." *Id.* 414 S.E.2d at 476. He then cited cases from four states: Colorado, Massachusetts, Wisconsin, and New York. The dissenting justice nonetheless concluded that "because of the speculative nature of these contracts, I do not disagree with the [Goldstein] majority that contingent fee contracts, in and of themselves, should not be treated as marital property subject to equitable distribution." *Id.*

In addition to the four states noted in the *Goldstein* dissent, Arizona and Louisiana also appear to have decided that contingent fee cases can be considered as marital property. In *Garrett v. Garrett,* 140 Ariz. 564, 567, 683 P.2d 1166, 1169 (1983), the Court of Appeals of Arizona stated that "an attorney's contingency fee contract is a valuable property right, though the contingency upon which it is based has not been fulfilled. The question then becomes whether the community is entitled to an interest in that property right and if so, the value of that community interest."

The *Garrett* court rejected a per se rule that property is separate or community based upon when the contract was made.

"The community is not entitled to the services expended by one of its partners either before marriage or after the marriage has terminated ... However, the community is entitled to such labors expended during marriage." *Id.* 140 Ariz. at 568, 683 P.2d at 1170 (citations omitted).

The court then stated that "... it is clear that the attorney's services performed during the marriage in fulfillment of the contract are community property and the community is entitled to what the percentage of the time expended as community labor bears to the time expended in reaching the ultimate recovery." *Id.* (citations omitted). The court approved of the trial court's continuing jurisdiction over the case to monitor the value of the services: "The contract sets the value of the services. Depending upon subsequent circumstances, the value of the services may be worth nothing, may be worth only a reasonable hourly fee, or may be worth the full value of the contract." *Id.*[4]

Similarly, in *Due v. Due,* 342 So.2d 161, 163 (La.1977), the Supreme Court of Louisiana stated that "[i]ncluded among the assets of the community, thus subject to inventory and spouses' joint ownership at the community's dissolution, are obligations based upon the right to receive money to become due in the future, even though this right is contingent upon the happening of an event at a future time." That court concluded that "the attorney's interest in pending contingent fee contracts constitutes a patrimonial asset which, if the contract is acquired during the marriage, forms part of the community insofar as its value is based upon the attorney's

---

**3.** We note two New York cases which involved the valuation of a law firm in matrimonial actions. First, in *Frink v. Frink,* 129 Misc.2d 739, 494 N.Y.S.2d 271, 272 (N.Y.Sup.1985), the New York Supreme Court, Trial/Special Term, stated that "a law practice is a proper subject for a distributive award," and explained that it would be guided by expert testimony as to the economic value of the practice. "The Courts are sensitive to the difficulties inherent in evaluating a negligence practice and the reluctance of an attorney in permitting a third party to examine his files. However, plaintiff offers no alternative method to establish the value of his outstanding cases." *Id.* In *Litman v. Litman,* 123 A.D.2d 310, 506

N.Y.S.2d 345, 347 (1986), the Supreme Court, Appellate Division, stated that "[t]he value of pending contingent fee case files is likely not reflected in ledgers, and the defendant is entitled to have such files considered by the expert."

**4.** *See also Pangburn v. Pangburn,* 152 Ariz. 227, 731 P.2d 122, 125 (1986), in which the Court of Appeals of Arizona stated that it was within the trial court's discretion to include in the community estate the renewal value of existing insurance policies ("Book of Business") procured by the husband-agent.

services performed during the marriage."[5] *Id.* at 165–66.

In a personal injury case, *Hanify v. Hanify,* 403 Mass. 184, 526 N.E.2d 1056, 1059 (1988), the Supreme Judicial Court of Massachusetts stated that:

[a] pending legal claim is distinguishable from an expectancy. The husband in this case has an enforceable, ripened, and pending claim for money damages. The damages include claims for income and assets lost during marriage. The loss affected both parties. Recovery of this loss should be considered an asset under [General Laws c. 208] § 34, because such recovery replaces monies that would have benefitted both spouses had the alleged legal wrong not occurred. The fact that the pending lawsuits are of uncertain value does not require their exclusion from the marital estate.

In a separate case decided that day, the Massachusetts court relied upon *Hanify* and held that "like the interest of a litigant in a pending lawsuit, the interest of an attorney in a contingent fee arrangement constitutes property under § 34." *Lyons v. Lyons,* 403 Mass. 1003, 526 N.E.2d 1063 (1988).

In *Weiss v. Weiss,* 122 Wis.2d 688, 365 N.W.2d 608 (App.1985), an attorney was involved in a stock buy-out of his interest in the law firm. In partial consideration for his sale of his interest, the lawyer was to receive "periodic payments representing contingent fee contracts in effect at the time of sale." *Id.* 365 N.W.2d at 612. The wife argued that the trial court improperly classified those payments as income to consider in determining a maintenance award, rather than as a marital asset subject to division. The Court of Appeals of Wisconsin agreed:

As to the contingent fee receivables, we recognize that it was impossible to establish a present value. The fact that an asset is impossible to value on the day of divorce, however, is not sufficient reason to ignore the asset when dividing the marital estate … Rather, it is within the discretion of the trial court to determine the appropriate division. …

Since the amount which Daniel will realize relative to the contingent fee accounts receivable is unknown and not ascertainable, but yet remains an asset in existence at the time of divorce, it would appear that the only context in which these accounts can be addressed is within that of a property division. …

*Id.* 365 N.W.2d at 613 (footnote omitted).

Colorado classifies contingent fee cases as marital property. In *In re Marriage of Vogt,* 773 P.2d 631 (Colo.App.1989), the husband was a partner in a law firm and, as such, he was entitled to receive a share in contingency attorney fees in five or six cases handled by the firm during the marriage. Undisputed evidence showed that, in the event of his death, his estate would be entitled to his interest in the fees.

The trial court awarded the husband an interest in all contingency fees *except* the Westbury fee and the Fairview fee. With respect to these two fees, the court found: "The contingency fees are marital property to the extent that [husband] performed the work entitling him to such fees during the marriage."[6] *Id.* at 632. The trial court then awarded the wife one-half of the husband's interest in those two fees.

The Westbury suit was settled just before the divorce was granted. The fee vested and matured during the marriage, although it

---

5. The *Due* decision was recently referred to in *Gessner v. Gessner,* 614 So.2d 307 (La.App. 4 Cir.1993), in which the Court of Appeals of Louisiana held that a professional degree and license obtained during the state's community property regime were not community property subject to partition. The court stated that "[t]he current rejection of the concept of a professional degree and license by the Louisiana Legislature and by the vast majority of courts … has occurred because neither a medical degree nor a professional license has the characteristics of 'property' as defined in a legal context." *Id.* at 309. The

court concluded that the definition of property in Louisiana "cannot be so extended and distorted to include within that definition a professional degree and license." *Id.*

6. In the subsequent case of *In re Marriage of Piper,* 820 P.2d 1198, 1201 (Colo.App.1991), the court stated that "[a] spouse's compensation which is deferred until after the dissolution, but fully earned during the marriage, is marital property."

386

was not collected. In the Fairview suit, a substantial verdict was obtained on behalf of the client of the husband's firm. Judgment was entered during the parties' marriage, but was on appeal when the court entered permanent orders. In its findings, the trial court recognized that the judgment could be reversed and that the case could require additional work before any fee was received.

On appeal, the Colorado Court of Appeals decided that "[d]eferred compensation earned during marriage but payable after dissolution constitutes marital property subject to division." *Id.* at 632 (citations omitted). The court found the Arizona Court of Appeals decision in *Garrett* persuasive and concluded that the trial court had properly included the husband's interest in both fees as marital assets subject to division.

The Court of Appeals found that settlement of the Westbury suit during the marriage removed the contingent nature of the fee and converted it into an account receivable. Thus, the husband's interest was subject to division as marital property.

As to the Fairview fee, the Court of Appeals concluded that the trial court had erred in part: "... the trial court should have limited its order to the portion of the husband's interest in the fee attributable to work done during the marriage." *Id.* at 633.

In the case now before us, the trial court relied in part upon our reasoning in *Hoak v. Hoak,* 179 W.Va. 509, 370 S.E.2d 473 (1988), and refused to consider contingent fee cases as marital property because their ultimate value is merely speculative. In *Hoak,* we held that a professional degree or license is not marital property subject to equitable distribution, explaining that "the value of a professional degree is the value of the enhanced earning capacity of the degree-holder. Not only is that value speculative, but also it represents money or assets earned *after* dissolution of the marriage." *Id.* 370 S.E.2d at 476-77.

▪ The appellant argues that contingent fee cases should be treated like pension plans and be subject to equitable distribution as marital property. In *Butcher v. Butcher,* 178 W.Va. 33, 357 S.E.2d 226, 233-34 (1987), this

Court explained that "[s]ince a pension benefit is an economic resource acquired with funds that would otherwise have been utilized by the parties during their marriage to purchase other assets, it constitutes marital property. This determination is made without regard to the possibly contingent nature of the pension, whether or not it has vested or matured." Quoting *Flynn v. Flynn,* 341 Pa.Super. 76, 491 A.2d 156, 160 (1985). In spite of their "possibly contingent nature," we find that when a contingent fee contract is acquired during marriage, it is "marital property" within the meaning contemplated by W.Va.Code § 48-2-1(e)(1).

Although the issue arose under different circumstances, this Court briefly discussed the value of services rendered by an attorney in a contingent fee case in *Hardman v. Snyder,* 183 W.Va. 34, 393 S.E.2d 672 (1990):

"Where an attorney has been discharged, without fault on his part, from further services in a suit just begun by him under a contract for payment contingent upon successful prosecution of the suit, his measure of damages is not the contingent fee agreed upon, but the value of his services rendered; and in the absence of evidence of the reasonable value of such services, no recovery can be had." Syllabus, *Clayton v. Martin,* 108 W.Va. 571, 151 S.E. 855 (1930).

*Id.* at syllabus. In *Hardman,* we noted that this was the general rule in other jurisdictions and cited the Arizona case discussed earlier in this opinion, *Garrett v. Garrett,* 140 Ariz. 564, 683 P.2d 1166 (App.1983). In *Garrett,* the Court of Appeals of Arizona held that "it is clear that the attorney's services performed during the marriage in fulfillment of the contract are community property and the community is entitled to what the percentage of the time expended as community labor bears to the time expended in reaching the ultimate recovery." *Id.* 683 P.2d at 1170. The Court rejected the husband's argument that the value of the community services should be based upon a reasonable hourly rate:

This overlooks the very nature of the contract—an all or nothing proposition. It is as unfair to require the attorney/spouse to

pay the other spouse for reasonable services rendered when ultimately no fee is earned because the litigation was lost as it would be to require the non-attorney/spouse to accept a sum based upon an hourly fee when the attorney/spouse receives compensation far exceeding that amount. The contract sets the value of the services. Depending upon subsequent circumstances, the value of the services may be worth nothing, may be worth only a reasonable hourly fee, or may be worth the full value of the contract. In this regard, we approve of the trial court's continuing jurisdiction over this matter to monitor the value of the services.

We have held that only that portion of the labor expended during marriage in fulfillment of the contract is to be considered community property.

*Id.*

We conclude that accounts receivable are assets with a value that can be ascertained at the date of separation and are considered to be marital property for purposes of equitable distribution. Contingent and other future earned fees which an attorney might receive as compensation for cases pending at the time of a divorce should also be considered as marital property for purposes of equitable distribution. However, only that portion of the fee that represents compensation for work done during the marriage is "marital property" as defined by our statute. Because the ultimate value of a contingent fee case remains uncertain until the case is resolved, a court must retain continuing jurisdiction over the matter in order to determine how to effectuate an equitable distribution of this property.

Next, the appellant argues that the trial court erred in refusing to find Mr. Metzner solely responsible for delinquent federal and state income taxes which allegedly resulted from his substantial waste of marital income on gambling and recreation. Addressing the payment of marital debts in its September 9, 1991, opinion, the trial court concluded that "the evidence did not support, to this Court's satisfaction, the plaintiff's contentions that the defendant wasted considerable money on gambling and the use of alcoholic beverages."

Upon review of the record, we find nothing to support the appellant's assertion that the trial court erred on this point. The appellant offered no evidence to support her assertion that she "had shown clear evidence that marital expenses on an annual basis were approximately $20,000.00 per year" and that "there was a lack of accounting by the husband as to where he spent the money he earned from his law practice." Actually, it appears as though Mr. Metzner was the only party who provided the trial court with any accountings whatsoever, as that court repeatedly noted that Mrs. Metzner did not file any types of financial disclosure reports.

Finally, in a cross-assignment of error, the appellee, Mr. Metzner, claims that the trial court erred when it ordered him to pay Mrs. Metzner $10,000.00, payable in two equal installments, to "reimburse" her for "her assistance to him while he studied law in Cincinnati and her assistance to him in his law practice, such as typing, answering the telephone, etc."

The record contains limited testimony on this issue. Mr. Metzner claims that most of the testimony was untrue, but that he did not rebut it. He points out that "Mrs. Metzner admitted that she had been paid wages for part-time work in the law partnership and the defendant's law office."

Our concern with this $10,000.00 award is that the trial court did not explain why it was ordering Mr. Metzner to pay this amount of money. Instead, the trial court seems to have picked an arbitrary figure and ordered that the appellee pay it, without specifying the evidentiary basis for the so-called reimbursement. Was this $10,000.00 to be viewed as reimbursement alimony, or perhaps as an attempt to remedy what the trial court believed was a previously inequitable distribution of the marital assets?

We find that the trial court may have abused its discretion in this instance. On remand, the circuit court may reconsider whether this type of award is appropriate. If so, the court should explain its authority

388

and rationale for making the award, as well as its method of calculating the award.

For the foregoing reasons, the September 9, 1991, order of the Circuit Court of Ohio County is reversed, and this case is remanded for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

NEELY, J., concurring in part and dissenting in part:

Now that the goose is cooked, Mrs. Metzner wants her share, but Mrs. Metzner did not pay for the goose, the fuel to cook it, the sauce to flavor it or even the pot to cook it in. The majority awards Mrs. Metzner the tender breast of the goose merely because the goose happened to wander into Mr. Metzner's yard while Mr. and Mrs. Metzner were still married. I dissent because Mrs. Metzner should pay for at least some of the costs of roasting the goose.

As I said dissenting in *Charlton v. Charlton,* 186 W.Va. 670, 678, 413 S.E.2d 911, 919 (1991): "... instead of being blunt about this Court's determination to make sure that women get whatever gold mine survives a nasty divorce while men get the shaft, the majority continues to pretend that they are 'interpreting' a sex neutral standard from...." *W.Va.Code* 48-2-1(e)(1) [1986], yet it is readily apparent that "[t]hey are not!" Therefore, to the extent that the majority opinion implies that mere acquisition of a contingent fee contract during marriage transforms it into marital property for distribution purposes under *W.Va.Code* 48-2-1(e)(1), I must disagree.

The majority cites an Arizona case holding that "it is clear that the attorney's services performed during the marriage in fulfillment of the contract are community property and the community is entitled to what the percentage of the time expended as community labor bears to the time expended in reaching the ultimate recovery." *Garrett v. Garrett,* 140 Ariz. 564, 683 P.2d 1166, 1170 (App.1983).

Just as the portion of fees received for services performed during the marriage in fulfillment of the contract should be considered community property, the expenditures incurred by the lawyer in fulfillment of the contract should likewise be apportioned. In other words, if the former Mrs. Metzner wants to share in the profits from Mr. Metzner's legal efforts up to the time of divorce in fulfilling a contingent fee contract, she must pay her share of the costs incurred by him. And, the costs must be paid at the time of divorce, i.e., before the outcome is known, and not after the fact.

Mrs. Metzner wants a percentage share in the total fees realized under the contracts, therefore equity demands that she should have to contribute the same percentage of her money towards the total costs of bringing in the fee. This is in keeping with the general theory behind marital property distribution. Property or assets gained through shared efforts, and expenditures to earn profits should be shared equally between the participants. *W.Va.Code,* 48-2-32(c) [1984], states:

"In the absence of a valid agreement, the court shall presume that all marital property is to be *divided equally* between the parties but may alter this distribution, without regard to any attribution of fault to either party which may be alleged or proved in the course of the action, after a consideration of the following [factors]...." [emphasis added].

The majority is awarding Mrs. Metzner a windfall here because she is not bearing her share of the costs incurred in earning the contingent fee. West Virginia is an equitable distribution state. The majority, in deciding to consider contingent fee contracts for marital property purposes, must not end it's equitable analysis there.[1]

Equitable distribution under *W.Va.Code* 48-2-1 [1992], *et seq.,* is a three step process: the first step is to classify the parties' property as marital or nonmarital; the second step is to value the marital assets; and the third step is to divide the marital estate

---

1. An order directing unequal distribution of marital property must specifically refer to the factors in *W.Va.Code* 48-2-32(c), and the facts in the record which support application of those factors. *See Somerville v. Somerville,* 179 W.Va. 386, 369 S.E.2d 459 (1988).

between the parties in accordance with the principles contained in *W.Va.Code* 48-2-32 [1984]. *See* Syllabus Point 1, *Signorelli v. Signorelli,* 189 W.Va. 710, 434 S.E.2d 382 (1993), Syllabus Point 2, *Wood v. Wood,* 184 W.Va. 744, 403 S.E.2d 761 (1991), Syllabus Point 1, *Whiting v. Whiting,* 183 W.Va. 451, 396 S.E.2d 413 (1990). The valuation of risky, costly, and speculative interests must be addressed with equal enthusiasm and concern for fairness—this is the area where the majority fails.

Equity is defined as "freedom from bias or favoritism".[2] The majority, in the continuing and unfortunate tradition of *Whiting v. Whiting,* 183 W.Va. 451, 396 S.E.2d 413 [1990], remains blinded by gender when fashioning decisions in the marital property arena. This gender bias has made the majority unable to contemplate an evenhanded distribution of communal liabilities incurred in the process of the acquisition of marital assets, when such costs should be shared equally by the party not actively practicing law.

In 1984, the Hon. Lawrence H. Cooke, speaking at a press conference announcing the formation of the New York Task Force on Women in the Courts, defined gender bias as "decisions ... made or actions taken because of weight given to preconceived notions of sexual roles rather than upon a fair and unswayed appraisal of merit as to each person or situation."[3] By continuing to treat women differently from men, the Courts are ultimately doing society as a whole a grave injustice. The findings of the numerous state task forces on gender bias in the courts agree with this view.

The Report of the New York Task Force on Women in the Courts states that: "[G]ender bias ... is a pervasive problem with grave consequences ... Cultural stereotypes of women's role in marriage and in society daily distort courts' application of substantive law. Women uniquely, disproportionately and with unacceptable frequency must endure a climate of condescension, indifference, and hostility."[4] Other states agree.[5] For example, the Connecticut Task Force on gender bias concluded "women are treated differently from men in the justice system and, because of it, many suffer from unfairness, embarrassment, emotional pain, professional deprivation and economic hardship." *Report of the Connecticut Task Force, Gender, Justice and the Courts* 12 (1991). *See also The Preliminary Report of the Ninth Circuit Gender Bias Task Force, Discussion Draft,* July 1992; *Final Report of the Washington State Task Force on Gender & Justice in the Courts* xiii, (1989) ("Bias is any action or attitude that interferes with impartial judgment.")

We have an obligation to take into consideration the fair market value of any marital asset subject to distribution. In Syllabus Point 4, *Kimble v. Kimble,* 186 W.Va. 147, 411 S.E.2d 472 (1991), we held that: "[i]n computing the value of any net asset, the indebtedness owed against such asset should ordinarily be deducted from its fair market value." *See also Signorelli v. Signorelli,* 189 W.Va. 710, 434 S.E.2d 382 [1993]. In this case, Mrs. Metzner seeks to recover contingent fees, when the bulk of the work done to recover the fee is the result of post-separation work performed by Mr. Metzner (i.e. not marital property subject to distribution). Furthermore, Mrs. Metzner expects to recover her "share" without any contribution to the post-separation costs and liabilities paid directly out of Mr. Metzner's personal account during his efforts to win the cases. The majority, in awarding her one-sided demands, once again denies justice at a husband's expense, reinforcing the sexual stereotype of all men being "deep pockets" to whom money means nothing.

Fairness and consistency is all I ask. Furthermore, our recent decisions in domestic cases should receive a prominent place on the

---

2. *Webster's New Collegiate Dictionary,* p. 387 (G. & C. Merriam Company, 1977).

3. *Report of the New York Task Force on Women in the Courts,* 15 FORDHAM URB.L.J. 15, 16 (1986-87) (hereinafter New York Task Force Report).

4. *New York Task Force Report, supra* note 3, at 17-18.

5. The West Virginia Task Force on Gender Bias has not yet released a report on the conditions in this state.

agenda of the newly formed West Virginia Task Force on Gender Bias in the Courts.

Fairness dictates that Mrs. Metzner's recovery be reduced by her share of post-separation overhead costs incurred by Mr. Metzner as a result of post-separation hours he worked on the case.[6] She also should be expected to bear some of Mr. Metzner's post-separation costs in preparing these cases that cannot be recovered from the clients. Such costs include expert witness fees, deposition costs, telephone, travel, and other litigation-related expenses that Mr. Metzner paid from his personal funds. The Court should also reduce Mrs. Metzner's share by the amount of any taxes that Mr. Metzner might be expected to pay on her share of his taxable income.[7] *See Hudson v. Hudson,* 184 W.Va. 202, 399 S.E.2d 913 [1990]; *Bettinger v. Bettinger,* 183 W.Va. 528, 396 S.E.2d 709 [1990].

The majority's pattern of misuse of the equitable distribution statute continues with this case. When one party is given the rewards, without the costs, of another party's independent efforts, unjust enrichment results. In *LaRue v. LaRue,* 172 W.Va. 158, 164, 304 S.E.2d 312, 316 (1983) (citation omitted), *overruled on other grounds, Butcher v. Butcher,* 178 W.Va. 33, 357 S.E.2d 226 [1987], we stated that claims for equitable distribution of marital property evolved out of circumstances where "the spouse seeking an interest in the property had made a substantial economic contribution toward the acquisition of the property." To the extent that such a contribution is lacking in Mrs. Metzner's case, her share of the fees should be reduced. The majority's valuation of Mrs. Metzner's share of the contingent fees earned by Mr. Metzner is simply unfair. One might say Mr. Metzner's goose was cooked.

---

6. Overhead, the cost to operate and maintain the law office, can be calculated by dividing the average annual cost by the days spent working on the fee cases at issue in this case. See *Brief for Appellee,* p. 45, Oct. 28, 1993.

7. Appellee's brief laid out the valuation scale for deductions to Mrs. Metzner's share of the contingent fees based upon the direct, indirect, and tax expenses payable out of Mr. Metzner's pocket in the course of working on these cases.