453 S.E.2d 666

**David Lee WHITE, Plaintiff Below, Appellee,**

**v.**

**Janet C. WILLIAMSON, Defendant Below, Appellant.**

**No. 22040.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 1994.

Decided Dec. 21, 1994.

---

**21. Parent and Child** ☞2(17)

In considering visitation issues, courts must be mindful of their obligation to facilitate right of noncustodial parent to full and fair chance to continue to maintain close relationship with his or her children.

Thomas L. Berry, Johnson & Holroyd, Princeton, for appellee.

James M. Cagle, Charleston, for appellant.

WORKMAN, Justice:

Janet C. Williamson appeals from the November 2, 1993, and the January 14, 1994, orders of the Circuit Court of Mercer County, in connection with the divorce proceedings initiated by her ex-husband, Appellee David Lee White. Through this appeal, Ms. Williamson challenges the lower court's deci-

sions, or lack thereof, pertaining to the equitable distribution of a contingency fee award, rehabilitative alimony, counseling for the parties' children, and restrictions regarding alcohol consumption during visitation.[1] After reviewing the record in this matter in conjunction with relevant precedent, we reverse and remand as to the issues of equitable distribution, rehabilitative alimony, counseling, and the court's failure to consider evidence regarding the need for visitation restrictions.

The parties, who are both practicing attorneys,[2] were married on December 21, 1982. Two children were born of the marriage; Kathryn in 1985 and Adrianna in 1990. The parties last cohabited on September 11, 1991. On September 16, 1991, Mr. White filed a complaint in circuit court, seeking a divorce on grounds of mental cruelty and irreconcilable differences.[3] Pursuant to bifurcated proceedings, the court below entered an order divorcing the parties on August 21, 1992, specifically reserving rulings on the issues of visitation, child support, alimony and equitable distribution.[4] Mrs. Williamson was awarded custody of the parties' two daughters.

By final order entered on November 2, 1992, the circuit court addressed those unresolved issues enumerated in the earlier order of August 21, 1992. Mrs. Williamson asserts

error in the circuit court's refusal to award her rehabilitative alimony and its decision to:

withhold[ ] any ruling on the law practice assets of either of the parties, in that the TXO litigation[5] is under appeal by the judgment debtor who seeks certiorari in the United States Supreme Court. At such time as there is a final determination in plaintiff's [Mr. White's] TXO litigation, he shall immediately notify his counsel who shall thereafter notify defendant's counsel. Thereafter, this matter shall be called to the Court's attention at which time the Court will determine what portion, if any, of said fees are marital assets.

By motion filed on July 6, 1993, Mrs. Williamson sought a final determination of assets, specifically those assets arising from Mr. White's fees from the TXO case. In this motion, Mrs. Williamson asserted that more than $13 million[6] had been deposited in Mr. White's law firm's account as the result of the upholding of the TXO jury verdict by the United States Supreme Court. *See TXO Prod. Corp. v. Alliance Corp.,* ―― U.S. ――, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).

By order dated January 14, 1994, the circuit court finally addressed the issue of the TXO fee:[7]

1. Plaintiff received a partnership portion of a legal fee earned by his law firm in a case commonly referred to in the testi-

---

1. Although Mrs. Williamson asserted error as to the trial court's entry of an order barring her from cohabiting with another male, Mr. White waived his right "pursuant to the Final Order to have the house sold upon Ms. Williamson's remarriage or cohabitation with a male companion." This statement of waiver was included in the brief filed by Mr. White with this Court.

2. They met at Ohio Northern University while Mr. White was a first-year law student and Mrs. Williamson was his legal writing instructor.

3. Mrs. Williamson admitted in her answer to the complaint that irreconcilable differences had arisen and alleged in her counterclaim that Mr. White was guilty of cruel treatment under West Virginia Code § 48–2–4(a)(4) (1992).

4. The August 21, 1992, order states that such ruling will "be held in abeyance until counsel hereto have submitted proposed findings of fact and conclusions of law within ten days of this hearing."

5. This reference is to *TXO Production Corp. v. Alliance Corp.,* 187 W.Va. 457, 419 S.E.2d 870

(1992), *aff'd,* ―― U.S. ――, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).

6. In her motion, she states that Mr. White provided her with the information regarding the amount deposited into the firm's account in connection with the upholding of the TXO verdict. The alleged increase in the verdict would have resulted presumably from the accumulation of interest during the appeal period. *See* note 10, *infra.*

7. At the time Mrs. Williamson filed this appeal, the circuit court had not made any ruling on the issue of the distribution of the TXO fee subsequent to its statement in its November 2, 1992, order referencing further rulings to be made upon a final determination of the TXO case. When this Court agreed to accept the appeal, we directed the circuit court to decide the remaining issues within thirty days of its receipt of our order. Shortly thereafter, the trial court entered the January 14, 1994, order.

mony as the TXO litigation. From said total fee received by the plaintiff [Mr. White], he should be permitted to deduct the income tax obligation, a debt owed his law firm, his portion of the st[a]ff bonus and any other legitimate costs. The balance retained by plaintiff from his fee should then be prorated so as to reflect that portion of the monies of which he would have been entitled if he had left the law firm on September 11, 1991, the date of the parties' separation. That portion of said net fee as of September 11, 1991, should be designated a marital asset subject to equitable distribution and divided equally between the parties. That portion of said net fee prorated subsequent to September 11, 1991, should be designated as the plaintiff's separate property.

The order further states, "[a]pplying the above referenced formula in paragraph 1, that net portion of plaintiff's legal fee to which he was entitled as of September 11, 1991, shall be designated a marital asset subject to equal distribution between the parties."[8]

### I. Equitable Distribution

 We first address the issue of equitable distribution with regard to the contingency fee award realized by Mr. White.[9] We recently ruled on whether a contingency fee contract is "marital property" within the meaning of West Virginia Code § 48–2–1(e)(1) (1992). In *Metzner v. Metzner*, 191 W.Va. 378, 446 S.E.2d 165 (1994), we held that: "When a contingent fee contract is acquired during marriage, it is 'marital property' within the meaning contemplated by West Virginia Code § 48–2–1(e)(1)." *Id.* at 379, 446 S.E.2d at 166. We further held in *Metzner*,

Contingent and other future earned fees which an attorney might receive as compensation for cases pending at the time of a divorce should be treated as marital property for purposes of equitable distribution. However, only that portion of the fee that represents compensation for work done during the marriage is actually 'marital property' as defined by our statute. Because the ultimate value of a contingent fee case remains uncertain until the case is resolved, a court must retain continuing jurisdiction over the matter in order to determine how to effectuate an equitable distribution of this property.

191 W.Va. at 379, 446 S.E.2d at 166, Syl. Pt. 5.

 Mrs. Williamson maintains that the circuit court committed reversible error in failing to comply with the clear requirement that trial courts follow a three-step process when effecting equitable distribution. In syllabus point one of *Whiting v. Whiting*, 183 W.Va. 451, 396 S.E.2d 413 (1990), we stated:

Equitable distribution under W.Va.Code, 48–2–1, *et seq.*, is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets. The third step is to divide the marital estate between the parties in accordance with the principles contained in W.Va. Code, 48–2–32.

183 W.Va. at 452–53, 396 S.E.2d at 414–15; *accord Signorelli v. Signorelli*, 189 W.Va. 710, 434 S.E.2d 382 (1993); *Wood v. Wood*, 184 W.Va. 744, 403 S.E.2d 761 (1991). Specifically, Mrs. Williamson contends that the trial court did little more than classify the

---

8. There was comparable language in the January 14, 1994, order concerning a contingency fee award that Mrs. Williamson received post-divorce whereby her fee was to be valued in the same manner as the TXO fee received by Mr. White.

9. West Virginia Code § 48–2–1(e)(1) provides, in part,:

(e) "Marital property" means:
(1) All property and earnings acquired by either spouse during a marriage, including every valuable right and interest, corporeal or

incorporeal, tangible or intangible, real or personal, regardless of the form of ownership, whether legal or beneficial, whether individually held; held in trust by a third party, or whether held by the parties to the marriage in some form of co-ownership such as joint tenancy or tenancy in common, joint tenancy with the right of survivorship, or any other form of shared ownership recognized in other jurisdictions without this state, except that marital property shall not include separate property. . . .

TXO fee as marital or nonmarital property. We agree.

The circuit court shirked its duty to value the TXO fee and then to actually divide such property. Although we clearly recognize the difficulty presented in performing such tasks, nonetheless, such duty was incumbent upon the lower court. Given the lower court's failure to value and then divide the funds represented by the TXO fee, we are required to remand this case to permit the trial court to finalize its duties pursuant to the formula set forth in *Whiting*. *See* 183 W.Va. at 452–53, 396 S.E.2d at 414–15, Syl. Pt. 1.

### A. Classification

■ Mrs. Williamson argues additionally that the lower court committed error in the manner in which it classified the TXO fee. She contends that the basis of the realized TXO fee was the jury verdict at the state court level, and because that verdict predates the date of the parties' separation,[10] the entire fee realized by Mr. White constitutes marital property. The trial court took the position that only that portion of the fee to which Mr. White would have been entitled had he left his law firm on the date of the parties' separation—September 11, 1991—is marital property and therefore, subject to equitable distribution. We think the answer lies somewhere in between these approaches.

The trial judge correctly looked to the date of the parties' separation as the beginning point for carving the TXO fee into marital and separate property. One of the statutorily enumerated definitions of separate property is: "[p]roperty acquired by a party during a marriage but after the separation of the parties and before the granting of a divorce...." W.Va.Code § 48–2–1(f)(5). Thus, the date of separation is the operative date for determining which portion of the TXO fee falls within the marital property category and which portion comes within the classification of separate property.

The method by which the trial court attempted to classify the TXO fee into marital and separate property, however, was misdirected. The trial court ruled that the only portion of the TXO fee which would qualify as marital property would be the amount that Mr. White "would have been entitled if he had left the law firm on September 11, 1991, the date of the parties' separation." Had Mr. White in fact resigned from the law firm on the date of his separation from Mrs. Williamson, he would presumably have been entitled to some part of whatever amount the firm eventually received. While the Court probably intended to describe that amount of the TXO fee which Mr. White had earned by virtue of his time invested in the case up to and including the date of the separation, the creation of such a legal fiction as a departure from the law firm is confusing and unnecessary. A far more logical approach is available.

■ As an initial matter, we observe that compensation for work performed prior to the separation is marital property.[11] *See* Syl. Pt. 5, *Metzner*, 191 W.Va. 378, 446 S.E.2d 165; W.Va.Code § 48–2–1(e). The remainder of the fee award, that which is attributable to work performed following the separation, constitutes separate property. *See* W.Va.Code § 48–2–1(f). Thus, in the event that post-separation work on a case in which a contingency fee award is ultimately obtained can be identified, such work must be accounted for and any monies attributable to such work should be treated as separate property within the meaning of West Virginia Code § 48–2–1(f).

Based on this ruling, whatever compensation Mr. White is to receive for time invested in the TXO case subsequent to the date of the parties' separation should be carved out from the amount of time that he had in the case prior to the separation. The distinctions between pre- and post-separation accumulations are the crux of the statutory differences between marital and separate prop-

---

10. The jury returned a verdict in the TXO case on June 22, 1990, for $10,019,000. The parties did not separate until September 11, 1991.

11. In many contingency cases, it may prove easier to calculate the amount of the fee which can

be attributable to work performed post-separation and simply deduct that amount from the total fee realized to arrive at the amount which constitutes marital property.

erty. *See* W.Va.Code §§ 48–2–1(e), (f). Clearly, that which is done post-separation and results in ascertainable earnings [12] was not meant to result in the accrual of wealth to the non-producing party, absent express agreement. *See id.* Because the record below was not adequately developed on this issue, we have no basis for determining whether Mr. White performed any work on the TXO case post-separation. On remand, evidence needs to be introduced regarding the amount of time pre- and post-separation that Mr. White worked on the TXO case.

## B. Valuation

■ We offer the following guidance to assist the court below in performing the necessary calculations to effect an equitable distribution of that portion of the TXO fee which qualifies as marital property. What must be done initially is a valuation of the specific amount of the TXO fee realized by Mr. White. From that amount, any legitimate liabilities should be deducted.[13] The suggested liabilities in the court's order of January 14, 1994, were an "income tax obligation, a debt owed his law firm, his portion of the st[a]ff bonus and any other legitimate costs." From a document produced by Mr. White for the first time during this appeal and identified as "Schedule 1," the following calculations are set forth:

| | |
|---|---|
| Mr. White's fee (25%) .......... | $608,183.98 |
| Bonus to Mr. White's secretary .. | 10,765.00 |
| Mr. White's share of B & O taxes | 6,095.30 |
| | $591,323.68 |
| Adjusted Fee | $591,323.68 |
| Federal income tax | 225,280.00 |
| State income tax | 38,696.00 |
| Debt to firm [14] | 32,750.00 |
| | $294,597.68 |

■ On remand, Appellee will have the opportunity to present evidence on these figures, and the trial court must not only be satisfied of their accuracy, but must also determine whether the claimed tax liabilities are directly and solely attributable to the TXO fee and not to Mr. White's income in general for the relevant tax year.[15] With regard to the secretarial bonus, Mrs. Williamson maintains that while such bonus is "laudable," it is nonetheless a voluntary payment which is not required by law or contract and therefore should be deducted only from Mr. White's separate share of the TXO fee.[16] Evidence needs to be developed regarding whether there was any firm-wide agreement that this secretary (or any of the secretaries or other support personnel)

---

12. We make this distinction in anticipation of a prospective case where the post-separation earnings cannot be directly connected to post-separation work. To illustrate, had Mr. White received his portion of the TXO fee merely by virtue of membership in the law firm without having worked on the case at all, it would be impossible to carve out any post-separation work from the fee. In that case, the entire contingency fee would constitute marital property, provided the contract which led to the obtainment of the fee had been entered into pre-separation.

13. In his concurring and dissenting opinion to *Metzner*, Justice Neely discusses a theory that the spouse who receives the benefit of a contingency fee award should be required to pay her share in earning that fee. *See Metzner*, 191 W.Va. 378, 388–89, 446 S.E.2d 165, 175–77 (Neely, J., concurring and dissenting). It is difficult to understand that reasoning, however, since it would require a different rule for lawyers than everyone else. Those engaged in other businesses routinely risk expenditures on ventures which may or may not prove profitable. A shop-owner expends sums of money on products with the hope of generating sales and a profit; similarly, those in service businesses incur expenses of doing business which are deducted from gross proceeds to determine profit. In these and other instances, any award of support or equitable distribution is assessed on the income or profit after expenses. Thus, the business of the practice of law must be treated the same.

14. This figure purportedly represents amounts of money that Mr. White withdrew as an advance of income. Provided that all such advances included within this figure were withdrawn pre-separation, we see no problem with this figure being subtracted from the amount of the TXO fee prior to calculating the amount of Mrs. Williamson's share of the fee pursuant to equitable distribution.

15. Mrs. Williamson, in her appellate brief, concedes that it is proper to deduct taxes and debt to the firm, but similarly questions whether the tax figures listed in Schedule 1 pertain solely to the TXO fee.

16. The voluntariness of the bonus paid to the secretary does raise the question of whether the bonus can be properly viewed as an attendant liability to be deducted from Mr. White's gross receipt of the TXO fee.

would receive a bonus in the event the contingency fee award was realized, or whether this was an act of generosity on the part of Mr. White. If it was a firm agreement to pay such secretarial bonus, then such amount might more properly be deducted from the entire firm's portion of the TXO fee prior to distributing it amongst the individual attorneys. If it was an amount voluntarily paid by Mr. White to his secretary without any attendant obligation to make such payment, then the bonus should be deducted only from Mr. White's share of the fee.

Through Schedule 1, Mr. White submits that of the net figure of $294,597.68 actually realized by him, $141,406.88 was the amount "realized in TXO litigation up to the date of separation." No accompanying documents were submitted which set forth the actual time spent on the case by Mr. White pre- and post-separation, thus there is no basis for accepting or rejecting such figures. The trial court should look into this issue very carefully, especially if Mr. White's law firm did not handle the appeal of the TXO case.

### C. Division

After the evidence is taken, the trial court should make thorough findings of fact and conclusions of law in reaching its valuation, and should then proceed to the division of what is ascertained to be marital property.

### II. Rehabilitative Alimony

■ We next address Mrs. Williamson's claim that the trial court erred in not awarding her rehabilitative alimony. The essence of Mrs. Williamson's contention is that her career took a backseat to Mr. White's during the marriage, and she should be compensated accordingly. Mrs. Williamson argues that her income was dramatically reduced when she moved with her husband to West Virginia; that she moved three times to accommodate Mr. White's career; and that she stayed home during the course of the marriage by agreement of both parties in order to benefit their two young daughters.

Regarding the issue of alimony, the trial court found in its November 2, 1992, order:

Plaintiff [Mr. White] is 36 years old and in good health. Defendant [Mrs. Williamson] is 37 years old and in good health. Both parties attained a Doctor of Jurisprudence degree prior to the marriage. Plaintiff is employed full time and is a partner in the law firm of Sanders, Watson and White. Defendant is employed part time as an associate lawyer with John Shott, Attorney at Law. *Defendant testified that her part time work is a matter of choice, and she has been offered full time employment.* According to her testimony, *her only impediment to working full time is her preference to devote more time to her children while they remain of tender years.* Having considered the factors to be considered in an award of alimony, as set forth in West Virginia Code, Chapter 48, Article 2, Section 16(b), the Court finds that defendant requires no period of time within which to become rehabilitated. Full time work is presently available to her, the eldest daughter is presently enrolled in grade school, and there is no evidence of any reason why the youngest daughter cannot continue in day care. Therefore, defendant's request for rehabilitative alimony should be denied, and both parties should be barred from asserting any claim for same. (emphasis supplied)

■ The trial court's finding suggests that no consideration was given to the concepts this Court enunciated in *Wyant v. Wyant,* 184 W.Va. 434, 400 S.E.2d 869 (1990).[17] In that case, we held in syllabus point five that "[t]he tender age of and custodial responsibilities for the children of a marriage must be considered when determining the amount and type of alimony to be awarded to a dependent spouse." *Id.* at 436, 400 S.E.2d at 871. Mrs. Williamson argues that because the parties agreed that she should stay at home until their children entered school, she should be entitled to rehabilatative alimony based on an extension of the rationale underlying the *Wyant* decision. *See id.* at 439–40, 400 S.E.2d at 874–75.

17. In the *Wyant* case, the wife sought permanent as opposed to rehabilitative alimony. In the instant case, Appellant seeks rehabilitative alimony only. However, many of the *Wyant* concepts are applicable here.

The *Wyant* case involved a husband who was a practicing lawyer and a wife who had two college degrees, including one in elementary education, but who had been a full-time homemaker and mother during the marriage. Mrs. Wyant was awarded rehabilitative alimony in the amount of $400 per month for three years. Mrs. Wyant argued that in making its award, the trial court failed to consider her responsibility as the primary caretaker of two young children as well as costs for child care if she returned to work. The circuit court in *Wyant* held that the tender age of the children was not sufficient to support the deferment of employment on the wife's part.

We determined that the lower court failed to assess the impact that custody of the children would have on her ability to become financially self-supporting. In so doing, we referenced West Virginia Code § 48–2–16 (1986) and its delineation of sixteen factors a court should consider when determining whether alimony should be awarded in a given case.[18] *See* 184 W.Va. at 439–40, 400 S.E.2d at 874–75. Upon examining these factors, we observed,

It is the opinion of this Court that the lower court abused its discretion by not realistically considering either (1) the income-earning abilities of each of the parties, based upon such factors as educational background, training, employment skills, work experience, length of absence from the job market, and custodial responsibilities for children, W.Va.Code § 48–2–16(b)(4); or (2) the extent to which it would be inappropriate for a party, because said party will be the custodian of a minor child or children, to seek employment outside the home. W.Va.Code § 48–2–16(b)(13).

184 W.Va. at 400, 400 S.E.2d at 875.

We further stated in *Wyant*,

The tender age of and custodial responsibilities for the children of a marriage must be considered by a court when determining the amount and type of alimony to be awarded to a dependent spouse. It is more out of our recognition of the needs of children of tender years, rather than the needs or desires of the dependent spouse, that we conclude that rehabilitative alimony may not be sufficient, or perhaps even appropriate, in a particular situation.

*Id.* Finally, we concluded:

A court should not relieve a supporting spouse from the duty to maintain the dependent spouse and children by providing only rehabilitative alimony simply because the dependent spouse may have skills nec-

---

**18.** West Virginia Code § 48–2–16 provides, in pertinent part:

The court shall consider the following factors in determining the amount of alimony, child support or separate maintenance, if any, to be ordered ...:

(1) The length of time the parties were married;

(2) The period of time during the marriage when the parties actually lived together as husband and wife;

(3) The present employment income and other recurring earnings of each party from any source;

(4) The income-earning abilities of each of the parties, based upon such factors as educational background, training, employment skills, work experience, length of absence from the job market and custodial responsibilities for children;

(5) The distribution of marital property

. . .

(6) The ages and the physical, mental and emotional condition of each party;

(7) The educational qualifications of each party;

(8) The likelihood that the party seeking alimony ... can substantially increase his or her income-earning abilities within a reasonable time by acquiring additional education or training;

(9) The anticipated expense of obtaining the education and training described in subdivision (8) above;

(10) The costs of educating minor children;

(11) The costs of providing health care for each of the parties and their minor children;

(12) The tax consequences to each party;

(13) The extent to which it would be inappropriate for a party, because said party will be the custodian of a minor child or children, to seek employment outside the home;

(14) The financial need of each party;

(15) The legal obligations of each party to support himself or herself and to support any other person; and

(16) Such other factors as the court deems necessary or appropriate to consider in order to arrive at a fair and equitable grant of alimony, child support or separate maintenance.

essary to facilitate a return to the job market. Instead, the court should consider the following factors before opting for rehabilitative alimony over permanent alimony: (1) the dependent spouse's position in the home at the time of the divorce; (2) the age of the children; (3) the parties' income at the time of the divorce and their potential income in the future; and (4) the benefit, where economics permit, of the dependent spouse remaining in the home to care for the children.

*Id.*

Certainly in many, if not most American homes where both parents work outside the home, such arrangement may not necessarily be by choice, but by economic necessity. Thus, in many families, one income is insufficient to support the family. The important concept enunciated in *Wyant*, however, that may be applicable to the instant case is that, when there *is* sufficient income and resources, a custodial parent may in some circumstances choose to remain home with preschool age children even if otherwise able to become fully employed, and the working spouse may be required to pay alimony to support that decision. Certainly, if this was the arrangement the parties agreed upon during their marriage, that should be an important consideration in enabling its continuation for the benefit of the children. Divorce is already painful enough for children; they should not be further penalized when there are adequate resources to permit the continuity of a stay-at-home parent.[19]

■■■■■ As we stated in syllabus point one of *Molnar v. Molnar*, 173 W.Va. 200, 314 S.E.2d 73 (1984), "The concept of 'rehabilitative alimony' generally connotes an attempt to encourage a dependent spouse to become self-supporting by providing alimony for a limited period of time during which gainful employment can be obtained." *Id.* at 201, 314 S.E.2d at 74. Similarly, rehabilitative alimony can be awarded where sufficient resources exist to compensate one party to a marriage who by agreement of the parties has remained at home during the course of the marriage to care for preschool children. Such rehabilitative alimony may be ordered to compensate the stay-at-home parent for loss of career advancement as a result of such agreement and/or to enable the parent to continue to be with the children until they begin school.

■■■■■ Our law is well-established that "[q]uestions relating to alimony and to the maintenance and custody of the children are within the sound discretion of the court and its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused." Syllabus, *Nichols v. Nichols*, 160 W.Va. 514, 236 S.E.2d 36 (1977). After reviewing the record in this case, we conclude that the trial court failed to inquire sufficiently into the issue of the parties' agreement that Mrs. Williamson would remain at home until the children were of school age. Provided that this was the reason Mrs. Williamson chose to· stay at home, that is to nurture and care for the children, rather than strictly due to an inability to obtain work, consideration should have been given to the issue of whether the income of Mr. White was adequate to permit such an arrangement to continue until the youngest child reached school age.

■■■■■ Mrs. Williamson clearly does not require training to re-enter the job market. Thus, it appears that the type of alimony she seeks is temporary alimony to supplement her income and allow her to be at home with the children until they enter school.[20] How-

---

19. As Justice Neely notes in his most recent book, *Tragedies of Our Own Making*, children have a better chance to thrive, emotionally and intellectually, if they have high-quality one-on-one nurturance in their early years by someone fully emotionally invested in them. *See id.* at 105–06 (noting comments of Jay Belsky, a Pennsylvania State University professor of clinical psychology).

20. According to the brief filed by Mr. White with this Court, Mrs. Williamson increased her employment to full-time following the final hearing in the proceedings below. Mr. White further states that Mrs. Williamson has also recently accepted employment as a part-time prosecutor in Mercer County. Since this is not a part of the present record, the circuit court should take evidence on these issues. If Mrs. White has returned to full-time work, it should be determined whether she did so out of economic necessity or

ever, her contention that her career and thus her income has suffered by her absence from the job market should also be examined, and the lower court should determine whether she should receive rehabilitative alimony to assist her in her efforts to attain an income level which correlates with her abilities and training had she not absented herself from the job market for the benefit of the children.

## III. Counseling

■ Another issue which we address is the correctness of the trial court's ruling on the issue of counseling for the parties' children. The court, in its November 2, 1992, order ruled that "psychiatric and/or psychological counseling on behalf of the infant children shall only be undertaken upon agreement of the parties." Mrs. Williamson argues, and we agree, that the effect of the trial court's ruling on this issue was to "take[ ] away from the custodial parent the right to choose what medical care her children need."

At the final hearing, Mr. White apparently took the position that the counseling services which the children had received were unnecessary. While this Court is not unaware of the possibility that a party could attempt to obtain and utilize psychological counseling for interests other than the appropriate ones, this does not negate the fact that a custodial parent generally stands in the best position to assess the needs of the minor children with regards to counseling.[21] Accordingly, we instruct the court below to modify its final order and to direct Mr. White to pay, consistent with his obligation for medical expenses, one-half of all psychological or psychiatric costs of the children in the absence of a showing that such services were unnecessary.

because she no longer desired to stay home with her pre-school children.

**21.** Since the parties do not appear to have fought below over the issue of custody, attempting to secure favorable testimony for one spouse does not appear to have been a motivating factor with regard to the counseling services. Additionally, since the amount of the counseling fees was not

## IV. Visitation Restrictions

The final issue which we address is the trial court's failure to consider evidence of alleged alcohol abuse on the part of Mr. White in connection with placing restrictions on his visitation rights. The trial court refused to admit any evidence on the issue of whether Mr. White has a drinking problem. At a hearing held on August 10, 1992, Mrs. White attempted to introduce evidence of a disorderly conduct charge that predated the parties' marriage and also evidence of an automobile accident which occurred approximately one year earlier. Notwithstanding the clearly stated basis for offering such evidence, the court refused to consider the same.

■ As to the disorderly conduct charge that occurred more than ten years ago, we do not believe the trial judge abused his discretion, as such evidence was too remote. However, the same cannot be stated with regard to the more recent automobile accident, provided there is evidence that alcohol was a contributing factor to the accident. Mrs. Williamson should have been permitted to introduce such evidence if alcohol was indeed determined to be a factor which caused or contributed to the accident. She should similarly have been allowed to develop her allegations regarding the need for imposing restrictions regarding alcohol consumption during Mr. White's exercise of visitation with his children. Despite the trial court's statement during the hearing, "Well, I direct Mr. White not to drink when he has the children," there is nothing in the various court orders reflecting the same admonishment. This was clearly an abuse of discretion on the part of the judge not to first develop this area to determine whether, in fact, Mr. White has a problem with alcohol which could impact the children. On remand, the circuit court should give the par-

raised on appeal as an excessive amount, it similarly does not appear that Mrs. Williamson was attempting to force Mr. White to pay exorbitant amounts just for the sake of spending his money, as is sometimes alleged in situations like these. Children caught in the throes of a divorce may benefit from counselling, and although it is desirable for both parents to confer about such matters, in the event of a dispute, this must remain primarily a decision of the custodial parent.

ties a fair opportunity to be heard on this issue, and if the evidence reflects that visitation should have any conditions or restrictions in order to protect the children, such restrictions, as necessary, should be ordered. In considering visitation issues, however, the court must also be mindful of facilitating the right of the non-custodial parent to a full and fair chance to continue to have a relationship with his children.

Based on the foregoing, the decision of the Circuit Court of Mercer County is hereby reversed and remanded on the issues of equitable distribution, rehabilitative alimony, counseling for the parties' children, and the court's failure to consider evidence on the issue of visitation restrictions consistent with this opinion.

Reversed and remanded.

BROTHERTON, C.J., did not participate.

MILLER, J., Retired, sitting by temporary assignment.

NEELY, J., dissents, and reserves the right to file a dissenting opinion.

NEELY, Justice, dissenting:

I dissent to footnote 13.