506 S.E.2d 820

**Bobbie J. SPEAR, Plaintiff below, Appellant,**

v.

**Mark C. SPEAR, Defendant below, Appellee.**

No. 24754.

Supreme Court of Appeals of West Virginia.

Submitted May 6, 1998.

Decided July 14, 1998.

Concurring Opinion of Justice Workman July 21, 1998.

Workman, J., filed concurring opinion.

Wesley W. Metheney, Esq., Wilson, Frame, Benninger & Metheney, Morgantown, West Virginia, Attorney for Appellant.

David J. Straface, Esq., Angotti & Straface, Morgantown, West Virginia, Attorney for Appellee.

PER CURIAM: [1]

This is an appeal by Bobbi J. Spear, ("the appellant"), from an August 28, 1997 order of the Circuit Court of Preston County that awarded custody of the parties' children to the father, Mark C. Spear ("the appellee"). Appellant argues that the circuit court erred in adopting the recommendations of the family law master. We reverse the circuit court's order and remand for the entry of an order awarding custody of the children to the appellant.

### I.

The parties were married on July 9, 1988. They separated on or about May 22, 1996, and the appellant filed for a divorce in Preston County thereafter. The parties had two children, both girls, ages 2 and 6 years.

Hearings were held before the family law master on April 28, 1997 and May 6, 1997. It was established that the appellant worked out of the parties' residence 5 days a week for West Virginia University Hospital, and that the appellee, a funeral director, worked at the couple's residence, located within a funeral home.

The appellant testified that she was the children's primary caretaker. She testified that on weekday mornings, the parties would equally divide the responsibility of getting the children ready for the day. She stated that she was primarily responsible for shopping and planning the meals. Appellant stated that while the appellee occasionally assisted the appellant in grooming, bathing and clothing the children, she was primarily responsible for these duties.

---

1. We point out that a *per curiam* opinion is not legal precedent. *See Lieving v. Hadley,* 188 W.Va. 197, 201 n. 4, 423 S.E.2d 600, 604 n. 4 (1992).

Sandra M. Byrne, appellant's sister, also testified on behalf of the appellant. Ms. Byrne testified that she stayed at the parties' residence approximately twice a month during weekend visits, and that when she was there, the appellant performed the duties of the primary caretaker for the two children. Ms. Byrne testified that the appellant fed the children, prepared their baths, dressed the children, laundered their clothes, was primarily in charge of discipline and performed housekeeping functions. Ms. Bryne further testified that the appellee would often be absent from the home on the weekends, to pursue his hobbies of hunting or volunteering at the local fire department.

The appellee testified that he was the primary caretaker of the children. He testified that the parties shared the responsibilities of child care when the appellant was home from work, but that during the day, other people would take charge of the children. The appellee stated that he, his father, his step-grandmother or a funeral home employee was responsible for the children during the work day. The appellee admitted, however, that he had purchased a second funeral home, and that for 6 months prior to the parties' separation, the parties had hired a babysitter for the children. Additionally, the appellee admitted that he often left the marital residence at irregular hours, because he was the only paramedic for the local volunteer fire department.

Carl R. Spear, appellee's father, testified that the appellee was the primary caretaker. However, the elder Mr. Spear stated that the children's paternal step-great-grandmother was primarily responsible for caring for the children during the working day. Mr. Spear said that he believed that the appellee performed most of the caretaking functions for the children.

Testimony for the appellee was also offered by the appellee's step-great-grandmother, Edith Spear. Ms. Spear testified that she lived close to the funeral home. She admitted to taking care of the children during the work day when the appellee was unable to do so. She could not recall how many times she had observed the appellee bathe the children. Ms. Spear also had no knowledge concerning who prepared food for the children.

Shelly Mitchell, a family friend, also testified on behalf of the appellee. Ms. Mitchell testified that she visited the parties' residence approximately once a month and stated that she believed that the appellee did the majority of the caretaking of the children. Ms. Mitchell testified that the appellee drove the children to activities and helped them at the beach.

Cindy Wilson, an employee of the appellee's funeral home, also testified on behalf of the appellee. Ms. Wilson testified that while the appellant was at work either the appellee or his step-great-grandmother would care for the children.

Finally, Linda Cuppett, a child day care worker, testified on behalf of the appellee. Ms. Cuppett testified that the appellant had brought the parties' older child to day care on 160 occasions and that the appellee had brought her 188 times.

After hearing all of the testimony, the family law master found the appellee to be the primary caretaker of the children and awarded custody of the children to the appellee with liberal visitation to the appellant.

The appellant filed a petition for review with the circuit court and both parties submitted briefs supporting their positions. After reviewing the recommended order of the family law master and the briefs submitted by the parties, the circuit court by an opinion letter dated August 28, 1997 affirmed the findings of fact and recommended order of the law master.

The appellant then filed a motion for stay, requesting that the court allow the children to remain with her while she appealed. Additionally, the appellant filed a motion for temporary stay of the execution of the final decree pending argument on her motion to stay. The circuit court granted the motion for a temporary stay. Oral argument was held on September 2, 1997. The circuit court denied the appellant's effort to reverse the court's adoption of the law master's recommended decision, and the court also denied appellant's motion to stay the instant order.

The appellant was ordered to transfer the children to the appellee.

The appellant forthwith filed a motion for stay in this Court pending appeal to this Court. We granted the appellant's motion for a stay pending appeal on October 2, 1997, and an appeal petition was timely filed by the appellant.

## II.

The standard of review for challenges to an order of a circuit court which adopts the findings of a family law master was set out in *Burnside v. Burnside*, 194 W.Va. 263, 460 S.E.2d 264 (1995), where we stated that:

> In reviewing challenges to findings made by a family law master that also were adopted by a circuit court, a three-pronged standard of review is applied. Under these circumstances, a final equitable distribution order is reviewed under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretations are subject to a *de novo* review.

Syllabus Point 1, *Burnside, supra*.

The appellant argues that the circuit court erred in granting custody of the parties' two children to the appellee. We have provided guidance in determining the custody of children in *Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981), in which we stated that "[w]ith reference to the custody of very young children, the law presumes that it is in the bests interests of such children to be placed in the custody of their primary caretaker, if he or she is fit." Syllabus Point 2, *Garska, supra*.

We have defined the primary caretaker as that "natural or adoptive parent who, until the initiation of divorce proceedings, has been primarily responsible for the caring and nurturing of the child." Syllabus Point 3, *Garska, supra*. We further explained that "[i]n establishing which natural or adoptive parent is the primary caretaker, the trial court shall determine which parent has taken primary responsibility for the caring and nurturing duties of a parent." Syllabus Point 4, *Garska, supra*.

In *Garska* we also set forth several specific duties performed for the child that the trial court should examine in determining which parent is the primary caretaker. These duties are as follows:

(1) preparing and planning of meals;

(2) bathing, grooming and dressing;

(3) purchasing, cleaning, and care of clothes;

(4) medical care, including nursing and trips to physicians;

(5) arranging for social interaction among peers after school;

(6) arranging alternative care, i.e. babysitting, day care, etc.;

(7) putting child to bed at night, attending to child in the middle of the night, waking child in the morning;

(8) disciplining, i.e., teaching general manners and toilet training;

(9) educating, i.e., religious, cultural, social, etc.; and

(10) teaching elementary skills, i.e., reading, writing and arithmetic.

*Garska*, 167 W.Va. at 69–70, 278 S.E.2d at 363.

Both parties in this matter testified that they were the primary caretakers of the children, and they also testified that the other party was a good and fit parent. Ms. Byrne, the sister of the appellant, was the only witness who stayed inside the parties' residence for any significant amount of time. Pursuant to her firsthand knowledge, she was able to testify that the appellant cooked, cleaned, disciplined the children, groomed the children, put the children to bed, and transported the children to appointments. None of the witnesses for the appellee were able to provide such information. Appellee's witnesses were able to testify that either the appellee, one of the appellee's family members or an employee would watch the children during the day, prior to the hiring of a full-time babysitter. However, this testimony does not address most of the duties set forth in *Garska*. None of the appellee's witnesses were able to testify about grooming, bathing, or food preparation. Ms. Cuppett

did testify that the appellee dropped off the older child at day care more often than the appellant, but the difference in the numbers is so small that it is obvious that this was a shared duty between the parties.

It appears that the family law master credited to the appellee those tasks that were performed by the appellee's family members or employees. By the appellee's own admission he was busy running two funeral homes, free-lancing for a funeral home in another county, and serving as the sole paramedic for the local volunteer fire department. In addition to these duties, the appellee admitted to leaving early in the morning during hunting season, and pursuing his hobbies during the weekends, leaving the children with the appellant.

Therefore, we find that the family law master was clearly wrong in finding that the appellee was the primary caretaker of the children. The record contains a paucity of evidence concerning actions performed by the appellee for the children. Instead, the record contains evidence of what the appellee's family members or employees did for the children. The conduct to be examined under *Garska* is the conduct by a party who is seeking to be found a child's primary caretaker, not the conduct of third parties.

## III.

Accordingly, we reverse the August 28, 1997 order of the Preston County Circuit Court and we remand this matter for an order granting custody of the children to the appellant.

Reversed and remanded.

WORKMAN, Justice, concurring:

(Filed July 21, 1998)

This case is one of those everyday tragedies of divorce that we in the court system see so frequently that we probably become enured to the real human pain involved when families are disrupted and most especially when custody and visitation issues must be resolved.

The good news about this case, if there is any, is that the record shows we have two excellent, loving parents, both of whom want continued close relationships with their children.

In *Lowe v. Lowe*, 179 W.Va. 536, 370 S.E.2d 731 (1988), this Court explained that joint custody should only be directed when the parties are amicable, live in close proximity, and can work together in a mutually cooperative manner.

As we explained: "A cardinal criterion for an award of joint custody is the agreement of the parties and their mutual ability to cooperate in reaching shared decisions in matters affecting the child's welfare." Syl. Pt. 4, *Lowe v. Lowe*, 179 W.Va. 536, 370 S.E.2d 731 (1988).

This is clearly the type of case where a joint custody plan maximizing the children's time with each parent giving regard to their work and school schedules would have been in the children's and parents' best interests. Unfortunately, after the parties draw lines of battle, it becomes very difficult to accomplish, and under the *Lowe* holding, is not something that a court can mandate absent such agreement.

One of the purposes of this separate opinion is to emphasize the need for the initiation of programs to facilitate the growth of mediation in domestic relations cases, especially those involving children. In *Carter v. Carter*, 196 W.Va. 239, 470 S.E.2d 193 (1996), Justice Recht encouraged mediation in divorce matters and recognized the substantial benefits to be derived therefrom. 196 W.Va. at 247–48, 470 S.E.2d at 201–02. The *Carter* opinion noted that "most research indicates that mediation can reduce the initial level of conflict, which can in turn reduce the long term level of conflict." *Id.* at 247, 470 S.E.2d at 201.

When mediation is required by the circuit court or family law master, the process might follow the two-session model used by most states with mandatory mediation. In that model during the initial session, the mediator evaluates the parties' situation to determine the appropriateness of mediation and whether the parties are willing to participate in good faith. During the initial session, the mediator usually discusses the process and the substantive issues and develops a plan for dealing with the issues.

During the second session the parties should try to reach an agreement. After the second session, the mediation process is evaluated by the parties and mediator and, when appropriate, terminated. Any agreement by the parties is reduced to writing and submitted to the court, for approval. Attendance and good faith participation at these sessions is generally sufficient to meet any mandatory requirement.

*Id.* at 248, 470 S.E.2d at 202 (footnotes and citations omitted).

My second purpose in writing separately is to emphasize that a child has a right to a continued relationship with his or her parent, as explained in syllabus point nine of *White v. Williamson,* 192 W.Va. 683, 453 S.E.2d 666 (1994), as follows: "In considering visitation issues, the courts must also be mindful of facilitating the right of the non-custodial parent to a full and fair chance to continue to have a close relationship with his children." Likewise, a parent has a right to a continued relationship with his or her child. The visitation "schedules" [1] commonly used by family law masters around the state are tools which were developed by the masters and have never been formally approved or otherwise officially promulgated. Although they may be useful in standardizing visitation schedules, they are of great concern because insufficient visitation threatens to destroy the right of parent and child to a continued meaningful relationship. Non-custodial parents traditionally have not had adequate opportunity to be with their children, rendering it very difficult for the parent-child relationship to flourish. The children in the instant case (and their father) have a right to a continued close relationship. It is hoped that no rancor or discord which may have resulted from this custody dispute will spill over into the arena of child visitation. Family law masters, although already swamped with large caseloads in many areas of the state, need to recognize that issues involving children are the most important; and that the time it takes to really work with the parties to develop visitation plans that will facilitate, not erode, each party's relationship with the child(ren) is the most productive time they can spend.

---

1. Schedule A is typically applied to cases where both parties live in-state, and generally provides every other weekend and an evening per week visitation. Schedule B is typically applied to cases where one party lives out-of-state and provides less frequent, but lengthier visitations with extended summer visitation.