OPINION OF THE COURT
John W. Sweeny, Jr., J.
This is a matrimonial action. The parties were married on September 9, 1974. This action was commenced on April 20, 2000. There are no children. The parties are physically separated.
Plaintiff is an attorney whose practice consists almost exclusively of plaintiff’s personal injury cases. Defendant works part time at a Home Depot store.
At the time of their marriage plaintiff was a high school teacher. During the course of the marriage he attended law school, graduating in 1978 and began practice thereafter. Since 1985 he has been in a partnership with the firm known as Tanzman and Cerbone in White Plains, New York. There is no written partnership agreement.
The parties have stipulated on a number of issues. This includes that plaintiff will pay defendant $18,000 a year in maintenance until defendant reaches the age of 65. There has also been agreements reached on, inter alia, division of the marital home, stock, the cars and marital debt. Counsel may set these forth with particularity in the judgment to be submitted at the end of this case.
The parties retained John Johnson of the firm of Bollam, Sheedy, Torani and Co. LLP, CPAs to value plaintiffs partnership interest in the practice. It was found to have a net tangible asset value of $18,000 of which one half or $9,000 was assigned to Mr. Tanzman. Mr. Johnson also valued Mr. Tanzman’s law license (all of which was obtained during the course of the marriage) between $204,000 and $238,000. The parties agreed they would take the average of the two figures for the purpose *217 of computation. Mr. Johnson also concluded that plaintiff had an annualized net pretax earning as an attorney of $99,500. His net base line earnings had he remained a teacher was calculated to be $60,000; therefore making an enhanced earnings capacity of $39,500 a year.
The major area where the parties are not in agreement concerns the valuation and the equitable distribution of the plaintiffs personal injury cases.
The parties agree that pending in plaintiffs office at the commencement of this action were 146 personal injury cases, all in different stages of preparation. The parties also agree that these cases constitute marital property (Grundfeld v Grund-feld, 94 NY2d 696 [2000]; Litman v Litman, 61 NY2d 918 [1984]; Block v Block, 258 AD2d 324 [1st Dept 1999]). To be determined is the value of these cases and what portion of the ultimate recovery in each is for defendant’s benefit.
The parties have stipulated to submit this issue on papers. They have even agreed on a listing of the pending cases including the type of case, the retainer agreement, if there was a referral fee and so forth. The cases have been categorized by the plaintiff as either (1) retained and/or subject to investigation; (2) pleadings having been prepared and/or served; (3) bill of particulars served; (4) a request for judicial intervention (RJI) having been filed; and (5) cases on the trial calendar with a note of issue having been filed. It was further stipulated that cases already resolved and the fees received at the time of the commencement of the action would be held in escrow pending the determination of the issue herein.
The parties have also agreed to the following: to resolve the question of tax impacting by making a one-third adjustment on all fees recovered; any recovery will be first adjusted for any fees owed to a referring attorney. Disbursements incurred before the commencement of this action will not be part of any calculation in distributing a fee. Disbursements incurred after commencement of this action (and subject to recovery) will be calculated as part of the fee.
Before the court addresses the defendant’s interest in the personal injury cases, there are related issues to be addressed. One is whether there should be a downward adjustment on any recovery for defendant for overhead expenses attributable to plaintiffs law firm incurred subsequent to the commencement of this divorce. The plaintiff wants to deduct that overhead. Defendant claims he is not entitled to. This court agrees with defendant.
*218 Plaintiff’s argument is that since the defendant wife would be receiving a percentage of the fees obtained by the plaintiff from contingency fee cases that she should therefore also have to contribute towards the overhead costs that were incurred in the operation of the law office; overhead expenses which were necessary to help generate the contingency fees. Plaintiff argues that not to do this would give defendant a greater percentage of the fees as her marital share than the plaintiff.
First of all, the court is not satisfied with the numbers for overhead that were given to John Johnson. A review of his report shows an extremely high percentage for overhead (a five-year average of 72% with a high of 80% in 1999) which seriously brings into question the accuracy of the expenses for a personal injury law practice. So also, defendant’s recovery will be based on the value of the cases as of the commencement of this action. She is not getting a percentage based on the full value at the end of the case, therefore she should not pay for a deduction for expenses incurred after commencement.
In support of her position that the recovery should not be adjusted for overhead, defendant submitted a letter by Joel Ra-kower of Financial Appraisal Services Limited. In response to the written question of should there be an adjustment for overhead expenses in the recovery of contingency fees Rakower stated:
“Initially one must recognize that accounts receivable, and work in process represent work that has already been done in a matter at a specific point in time. The expense of the firm in completing work to that point in time has been recognized. Allocating the amount of work in process of a contingency fee case is no different. One is assigning the fees (revenue) to be recognized to this off balance sheet asset, as of a specific date. One can argue that the firm will incur expenses to collect the funds, however, this argument has been traditionally dismissed * * * .”
It is interesting to note that Mr. Rakower treats the contingency fee cases as accounts receivable where at the date of commencement of the matrimonial the overhead has already been fully incurred by the firm. The court disagrees. The cases cannot be deemed accounts receivable because being contingent in nature, an express value cannot be put on those cases unless and until a recovery is obtained.
*219 Notwithstanding that disagreement, the court still cannot accept plaintiffs reasoning that a set amount for overhead expenses should be deducted before defendant’s fee is determined. As stated, the court cannot accept the high percentage for overhead sought by plaintiff in the first place. It should be noted that even Mr. Johnson stated that some of the money was given back for personal use by Mr. Tanzman and his partner. There is also no clear way to determine how much overhead was actually incurred for these particular cases which are the subject of this action, how much for the general operation of the office including other matters such as real estate files, etc. Furthermore, much of overhead expenses can be used as a business expense which can be deducted on behalf of the plaintiff and for which the defendant gets no benefit, especially since the plaintiff will be submitting individual tax returns subsequent to the completion of this matrimonial action.
In short the court does not see the basis why the defendant should have to have a reduction in the fees payable to her as a result of these expenses,
There is also an issue as to whether maintenance, already agreed to (infra), should be adjusted by the fee recovery defendant is to receive. Plaintiff addresses the concern set forth in McSparron v McSparron (87 NY2d 275 [1995]) and Grunfeld v Grunfeld (94 NY2d 696 [2000]) that once an income stream is dedicated for a certain purpose (in this case the fees from the cases as defendant’s share of equitable distribution) it may not also be used for other income (in this case, maintenance). Plaintiff argues that since his income is almost totally derived from the proceeds of personal injury cases, this cannot be used for both equitable distribution and maintenance; and that a reduction in the latter is necessary to avoid the infamous “double dipping” (McSparron, supra; Grunfeld, supra; see also, Sodaro v Sodaro, 286 AD2d 434 [2d Dept 2001]; Reczek v Reczek, 239 AD2d 867 [4th Dept 1997]; Wadsworth v Wadsworth, 219 AD2d 410 [4th Dept 1996]).
This court is well aware of the admonition in McSparron which warned:
“to ‘be meticulous in guarding against duplication in the form of maintenance awards that are premised on earnings derived from professional licenses’ (id.). To allow such duplication would, in effect, result in inequitable, rather than equitable, distribution. In contrast to passive income-producing marital property having a market value, *220 the . value of a professional license as an asset of the marital partnership is a form of human capital dependant upon the future labor of the licensee. The asset is totally indistinguishable and has no existence separate from the projected professional earnings from which it is derived. To the extent, then, that those same projected earnings used to value the license also form the basis of an award of maintenance, the licensed spouse is being twice charged with distribution of the same marital asset value, or with sharing the same income with the nonlicensed spouse.” (Grunfeld v Grunfeld, supra at 704-705.)
So also, this court is well aware that the principal source of income for plaintiff is the fees from the personal injury cases.
Defendant makes an interesting argument that the agreed to maintenance can be preserved from a separate income stream. John Johnson’s figures, accepted by both sides, showed that plaintiffs income as a teacher, i.e., without his enhanced earnings, was $60,000 a year. Defendant admittedly has emotional problems (the full extent of which has not been agreed to). She only earned some $11,400 in 2000, all from different part-time jobs. Although the court indicated to counsel that she could be expected to work more hours, nonetheless, with her condition, her age and lack of meaningful, recent work experience, a maintenance award of $18,000 a year from just the nonenhanced earnings of $60,000 would be reasonable (see Hartog v Hartog, 85 NY2d 36 [1995]; Raviv v Raviv, 153 AD2d 932 [2d Dept 1989]). This, defendant argues, leaves the enhanced earnings, i.e., the fees plaintiff earns as an attorney, as a separate source for equitable distribution.
Although the argument is interesting, it is unavailing. This is not a situation such as in Grundfeld (supra at 706) where there are separate assets, such as stocks, which can be used for maintenance, leaving the enhanced earnings of the practice for equitable distribution. Here, virtually all plaintiff makes comes from the same stream of income for all awards, i.e., any percentage of the recovery for the fees given to defendant will be from the same source as the maintenance.
Therefore, any recovery defendant ultimately earns (to be discussed) will first be reduced by the maintenance she is guaranteed of $18,000 a year.
The final principal issue to be discussed is the valuation of the plaintiff’s contingent fee cases and the method of *221 distribution. The parties have wisely agreed that the true value of the cases will not be known until each is resolved. They also agree that a percentage value should be assigned. How this will be done shall be discussed.
The choice of adverb for counsel’s agreement is borne out by the fact that the issue of valuation for contingency fee cases is a vexing one. It has been addressed by a number of courts (not many, however, in New York), yet has yielded few helpful solutions for us. It is helpful, in context, to look at some of the ways that have been addressed to best appreciate what has been agreed to here.
One method is to use the number of hours actually spent on each case, i.e., by time sheets. This was a suggestion made in Block v Block (258 AD2d 324 [1st Dept 1999]). Yet, it also assumes that the attorneys keep accurate time records; something for which plaintiffs personal injury attorneys have never been known. In any event both sides have specifically declined to argue in favor of this method and there has been no proof submitted by either side that in fact plaintiff did keep time records for the personal injury cases.
Another method is to wait until each case is over and then apply an appropriate percentage to each case based upon the amount of work performed before and after the commencement of the matrimonial (In re Marriage of Kilbourne, 281 Cal Rptr 211 [Cal Ct Appeals, 1st Dist 1991]; Garrett v Garrett, 140 Ariz 564, 683 P2d 1166 [1984]). This could lead to suspicion where defendant could argue that plaintiff merely “padded” the hours after commencement to deny her an appropriate recovery (see 1 Tippins, Equitable Distribution The Comprehensive Course, at 313 [Mat Law Publ 2001]).
Another method would be if the parties could actually agree to the value of the cases before hand (Musser v Musser, 909 P2d 37 [Okla Sup Ct 1995]). In Musser, an attorney had all workers’ compensation cases and an estimated value of $2,000 for each one was accepted. This would not be feasible with the variety of cases plaintiff has here.
Another method would be to have the files evaluated by an independent personal injury attorney or group of attorneys and then take the average figure as the agreed to value there. (Frink v Frink, 129 Misc 2d 739 [Dutchess County 1985]; Metzner v Metzner, 191 W Va 378, 446 SE2d 165 [1995].) The problem with that, of course, is that with 146 cases pending it would require a great deal of work by the attorney or attorneys who agree to do this. An issue would naturally arise as to whether *222 plaintiff would feel comfortable allowing other attorneys to see his cases. An additional problem is how these attorneys would be paid. Also, even if a value was placed, with the vagaries of a personal injury practice, these cases even with a reasonable value placed on them, could end up in a no cause verdict or for whatever other reason end up with no or a smaller than anticipated recovery for plaintiff, thereby giving defendant a windfall.
Another method to be used could be quantum meruit, the method used when an attorney is discharged from a case prior to the ultimate recovery. (Judiciary Law § 475; Martin v Camp, 219 NY 627.) This was somewhat akin to the percentage of time spent on each file discussed above.
Clearly, the only way to be assured of a case’s worth is to require defendant to wait along with the plaintiff until each case is disposed of. It would then be up to defendant who has a list of the pending cases to seek an appropriate accounting from the plaintiff at reasonable intervals to inquire as to the status of the outstanding cases. The most equitable way to determine the respective interest of each party in the cases is to assign a percentage of value to the cases depending upon how far along they are at the time of commencement of the matrimonial. In determining the value the parties have each suggested percentages to be applied.
Plaintiff suggests a value of 10% at the initial information gathering portion of the case, 20% after process has been served, 30% after the response to the demand for a bill of particulars as well as service of the RJI and 50% upon the filing of the note of issue. The remaining 50% therefore involving preparation for trial, settlement negotiations and if necessary the trial itself and the verdict rendered.
Defendant has submitted a percentage figure submitted by Joseph J. Brophy, an experienced personal injury attorney himself. Mr. Brophy argues that one third of the value of the case is established at the time the case first comes through the door. As proof of this is the fact that attorneys will often pay one-third referral fees to an attorney to get a case from them, even though the referring attorneys may have done little work on the preparation of the case. Mr. Brophy then suggests that the next one third of the value of the case is done in what he calls the paper and discovery phase. The remaining one third represents the value of any services performed after the case is placed on the trial calendar. Therefore, Mr. Brophy argues that a reasonable proportion of the value earned is one third *223 for cases accepted but not yet in suit; 40% for cases in which a complaint has been filed; 50% for cases in which a bill of particulars has been exchanged; 60% for cases in which the RJI has been filed and 70% for cases on the calendar.
A key difference between the two suggestions is clearly on what percentage should be ascribed for the case that just comes in the office. This court agrees with the Brophy suggestion. The true value of a personal injury case rests on the facts. Whether it is a medical malpractice where liability is clear or an intersection collision where there may be a threshold issue, the intrinsic value is set before the attorneys get involved. Obviously, there are variables such as what county the case is ven-ued in, who the carrier is and so forth. Adi of these may well affect the eventual outcome but the range of value is there at the outset. Therefore, a one-third value at the outset is far more realistic than the 10% sought by plaintiff. So also, the percentages that follow from this on the Brophy suggestion are consistent and most realistic.
Both attorneys agree that there must be the appropriate deduction for fees due a referral attorney when that is appropriate. It is agreed that the standard for this is usually one third. However, it is noted that the plaintiff’s attorneys herein have an agreement with the plaintiff to get 40% referral fee for their cases. Since these have been the two ways of operating for plaintiff in the past, there is no reason to disturb them now.
The remaining issue is how to deal with cases that are sent to arbitration. Again, the value of the case is present when it first comes into the office, whether it later ends up in a courtroom or in arbitration. So also, from this court’s experience most cases are taken off the court’s calendar and sent to arbitration only after some discovery and trial preparation is done. Therefore, the suggestion of Mr. Brophy of one third at inception, another third for the period up to submission and the remaining third after submission and decision is appropriate and is adopted.